**UNITED STATES of America,**
**Plaintiff,**

v.

**(D–1) Karim KOUBRITI, (D–2) Ahmed Hannan, and (D–4) Abdel Ilah Elmardoudi, Defendants.**

No. 01–80778.

United States District Court,
E.D. Michigan,
Southern Division.

Dec. 16, 2003.

Asst. U.S. Attorney Eric Strauss, Detroit, MI, for the Government.

Leroy Soles, Rick Helfrick, James Gerometta, Federal Defenders Office, Detroit, MI, for Defendant Koubriti.

Jim Thomas, Detroit, MI, for Defendant Hannan.

Bill Swor, Detroit, MI, for Defendant El Mardoudi.

Steve Rabaut, St. Clair Shores, MI, for Youssef Hmimmsa.

## OPINION AND ORDER REGARDING DEFENDANTS' MOTION TO REQUIRE ATTORNEY GENERAL TO SHOW CAUSE WHY HE SHOULD NOT BE HELD IN CONTEMPT

ROSEN, District Judge.

### I. INTRODUCTION

This case began just six days after the September 11, 2001 terrorist attacks on

New York and Washington, D.C., when three of the Defendants were found at an apartment where federal and state law enforcement officials had hoped to locate an individual on the FBI's "watch list" of suspected terrorists or associates of known terrorists. These arrests generated a substantial amount of media coverage, in light of the public emotions aroused in the immediate wake of the September 11 attacks and the link to a man suspected of associating with terrorists. This attention only increased as the Government augmented its initial document fraud charges with more serious terrorism-related charges, and as it began to appear that this might well be (and, in fact, was) the first case to proceed to trial on terrorism-related charges since the September 11 attacks.

Against this backdrop of momentous national tragedy, heightened public and media interest, and the challenge of ensuring a fair trial for individuals of Middle Eastern origin in a case involving allegations of terrorism-related activities, the parties and their counsel quickly and unanimously suggested that the Court enter an order regulating public statements by the parties or their attorneys concerning this case. Thus, in the early days of this case, the Court issued a stipulated Order Concerning Public Communications by Parties or Lawyers, which was signed by counsel for all parties. Generally speaking, this Order prohibited the public disclosure of information that had a reasonable likelihood of interfering with a fair trial or otherwise prejudicing the proceedings.

This Order generally achieved its purpose, despite a number of challenging developments during the course of these proceedings. Some lamentable incidents did arise, however, and two of the more serious of these directly involved this Nation's highest law enforcement official, United States Attorney General John Ashcroft. Specifically, the Attorney General referred to this case at two separate press briefings in Washington, D.C., once near the outset of this case and again in the middle of the trial. In the first instance, Attorney General Ashcroft erroneously stated that the three Defendants arrested on September 17, 2001 were "suspected of having knowledge of the September 11th attacks." On the second occasion, the Attorney General referred to a cooperating Government witness who had just completed his trial testimony, opining that this individual's testimony had "been of value, substantial value" to the Government.[1]

Defendants raised contemporaneous and strenuous objections to these incidents, and some immediate prophylactic steps were taken. The Court elected at the time, however, to defer its ultimate disposition of these matters until after the trial, in order to avoid disruption of pretrial preparations and the conduct of the trial itself. Defendants now have renewed their objections, through a formal motion requesting that the Court order the Attorney General to show cause why he should not be held in contempt for violating the Court's Order regarding public communications. To date, the Court has issued only a more limited Order, directing the Attorney General to show cause in writing why he should not be compelled to appear for a hearing to address Defendants' motion.

As is evident from the foregoing, this matter poses a considerable challenge to

---

1. Still another serious incident occurred when a draft version of the Second Superseding Indictment, which added terrorism-related charges for the first time, was leaked to the media before it had been returned by the grand jury. There is no evidence, however, that the Attorney General was involved in this troubling episode. Nonetheless, it has some relevance to the present matter, as discussed below.

the Court, demanding the reconciliation of a number of important, and sometimes competing, judicial and institutional concerns. First and foremost, it is the duty of this Court to ensure that Defendants have been afforded a fair trial consistent with the guarantees and dictates of our Constitution. Next, it cannot be gainsaid that this or any Court must stand behind its orders and apply them equally to all, without regard for station or title. As a co-equal branch of government under this Nation's constitutional design, the judiciary is entitled to the respect of executive and legislative officials, no matter how senior or subordinate. At the same time, however, this Court recognizes that it may not trespass upon or unduly impede the functions entrusted by the Framers to the other branches of government.

As weighty and nuanced as these considerations might be, the present matter ultimately is amenable to resolution through the process routinely employed by the courts—namely, the application of the relevant legal standards to the facts of this particular case. The pertinent facts here are largely undisputed, and the governing law is reasonably well settled. For the reasons stated below, the Court finds that the Attorney General's public statements about this case violated the terms of the Court's Order regarding communications, if perhaps only inadvertently. The Court further determines, however, that there is insufficient evidence of willful misconduct or prejudice to the rights of Defendants to warrant the drastic and constitutionally problematic measures of instituting criminal contempt proceedings against the Attorney General or compelling him to appear at a hearing and give testimony concerning his actions.

Nevertheless, in light of the particular circumstances surrounding the Attorney General's conduct, which will be detailed below, the Court finds that it cannot simply ignore repeated violations of its Order. The Attorney General's Office exhibited a distressing lack of care in issuing potentially prejudicial statements about this case, one of which came after senior Justice Department officials were directly and expressly advised by the Court, on two separate occasions, that the Order had been entered and would be strictly applied to all, including the Attorney General and his staff. In addition, the Court is concerned that, despite the explicit warnings given in this case, the Attorney General apparently did not take sufficient steps to reform the procedures used in his Office, in order to ensure that staff members with significant prosecutorial experience carefully review any proposed references to pending cases to verify that they comport with all applicable ethical guidelines and court orders.

Despite his unquestioned duty to address the Nation on matters of public concern, and his more specific responsibility to keep the Nation informed of the Justice Department's efforts in the war on terror, the Attorney General has an equally vital and unyielding obligation, as the Nation's chief prosecutor, to ensure that defendants are accorded the fair trial guaranteed to them under our Constitution. In this case, this essential balance was jeopardized, even after the Court had issued specific warnings. Accordingly, the Court finds that a public and formal judicial admonishment of the Attorney General is the appropriate sanction to address this concern.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Circumstances Surrounding the Entry of the October 23, 2001 Order Concerning Public Communications by Parties or Lawyers

In order to place this matter in its proper context, it is necessary to recall the

circumstances that led to the entry of the October 23, 2001 Order, and to recount the several occasions when the Court was called upon to address issues relating to this Order.[2] In the early days of this case, Defendants filed a motion in which they quoted the following statement by Justice Oliver Wendell Holmes:

> The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.

(Defendants' 11/29/2001 Motion for Continuance in Light of Excessive and Inflammatory Pretrial Publicity, Br. in Support at 1 (quoting *Patterson v. People of Colorado ex rel. Attorney General of Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907))). This same motion was accompanied by a list of hundreds of reports in the local, national, and worldwide media regarding Defendants and this case, with nearly all of these articles also mentioning the September 11, 2001 attacks on New York and Washington, D.C.

Such a juxtaposition was to be expected under the circumstances. Three of the four Defendants in this case[3] were apprehended just six days after September 11, by Detroit Joint Terrorism Task Force agents who were looking for Nabil Al–Marabh, an individual listed on an FBI "watch list" of people suspected to be involved in some way in terrorist activities. The agents sought to interview Al–Marabh as someone who might have knowledge regarding the September 11 attacks, and the apartment where they sought him, at 2653 Norman Street in Detroit, Michigan, listed Al–Marabh's name on the mailbox.

Upon arriving at the Norman Street residence, the agents did not find Al–Marabh, but instead were greeted at the door by Defendant Karim Koubriti. Mr. Koubriti gave permission for the agents to follow him inside the apartment, where Defendants Koubriti, Ahmed Hannan, and Farouk Ali–Haimoud were found to be living as apparent transients, with no furniture to speak of and their clothing kept in duffel bags, suitcases, and garbage bags. A search of the premises revealed several suspicious items, including fraudulent passports, visas, social security cards, and alien registration cards. The agents also discovered a day planner which contained references to an American military base in Turkey, an "American foreign minister," and a Jordanian airport, as well as sketches which purportedly depicted airport flight lines, aircraft, and runways. In addition, two SkyChef/Detroit Metropolitan Airport badges were found in the apartment, bearing the pictures of Defendants Koubriti and Hannan.

Against this backdrop, certain practical concerns were evident to the parties and the Court alike. In the immediate wake

---

**2.** In setting forth the background of Defendants' motion, and in its subsequent rulings on the legal issues presented in this motion, the Court has endeavored to rely exclusively on facts which are undisputed in the record. For reasons discussed below, the Court finds it unnecessary and inappropriate to develop a further record in this matter, or to take any additional steps to resolve any factual disputes which might exist in the present record.

**3.** In the course of the several indictments issued in this case, certain defendants have been added and others have been removed. When this case went to trial in March of 2003, the three above-captioned individuals remained as Defendants, along with Farouk Ali–Haimoud. The jury returned a verdict on June 3, 2003 acquitting Defendant Ali–Haimoud on all charges, while the other three Defendants were convicted on one or more counts of the third superseding indictment. These three remaining Defendants brought the motion presently before the Court.

of September 11, terrorism task force agents had apprehended three young men of Middle Eastern origin in an apartment previously occupied by an individual on the FBI's "watch list" of people suspected of terrorist ties. A number of suspicious items, including fraudulent identification papers, had also been found in this apartment. It was inevitable, under these circumstances, that media reports of Defendants' arrest and indictment would be accompanied by references to the September 11 attacks. This, of course, suggested the very real danger that the potential pool of jurors would associate Defendants with the tragic events of that day.

Yet, the Government has *never* alleged, either at the outset or at any other point in these lengthy proceedings, that these Defendants had any connection whatsoever to the terrorist attacks on New York and Washington, D.C. Nor did any of the evidence offered at trial even suggest such a link. Indeed, the initial indictment in this case charged Defendants solely with document fraud. The first charges and allegations of terrorism-related activities did not appear until the grand jury returned the Second Superseding Indictment on August 28, 2002, nearly a year after Defendants Koubriti, Hannan, and Ali–Haimoud were taken into custody.

The demographics of the greater Detroit area posed an additional concern. In the wake of September 11 and the publicity surrounding Defendants' arrest, tensions and sensitivities were extremely high in this area, a community which includes the largest Middle Eastern population outside of the Middle East. This raised the prospect that this case might become a focal point in the escalating community debate about larger social and political issues.

It was immediately apparent to the Court and counsel, therefore, that a num-ber of steps were necessary to "lower the volume" concerning this case, in order to ensure that it was tried in court rather than the media and that prospective jurors did not form preconceived notions that might jeopardize Defendants' right to a fair trial. Various such measures have been employed throughout these proceedings, including the preparation of a detailed 26–page questionnaire to explore the attitudes of prospective jurors and their awareness of the media reports about this case, extensive individual voir dire of each prospective juror, and the empaneling of an anonymous jury. *See United States v. Koubriti,* 252 F.Supp.2d 424, 426–27 (E.D.Mich.2003) (describing the questionnaires given to prospective jurors); *United States v. Koubriti,* 252 F.Supp.2d 418, 419–20 (E.D.Mich.2003) (addressing the selection of an anonymous jury).

In addition, in the very early days of this case, the parties and the Court quickly agreed upon the terms of a "gag order" governing public communications about this case. At an initial status conference convened shortly after Defendants were arrested and initially charged, counsel for both the Government and Defendants suggested that such an order would be appropriate, and the Court readily agreed. The Court then invited counsel to draft and agree upon the language of this proposed order, and they returned within a few days to present their proposal.

Counsel's suggested language was incorporated, essentially without alteration, into the October 23, 2001 Order that forms the basis for Defendants' present motion. This "Order Concerning Public Communications by Parties or Lawyers" is quite brief, and provides in its entirety:

> Upon agreement of the Defendants and their attorneys and the attorneys for the Government, and to prevent the reasonable likelihood of prejudicial pre-

trial publicity and to protect the due administration of justice, it is ORDERED that:

A.  None of the lawyers appearing in this case or any persons associated with them will release or authorize the release of information or opinion about this criminal proceeding which a reasonable person would expect to be disseminated by any means of public communication, if there is a reasonable likelihood that such disclosure will interfere with a fair trial of the pending charges or otherwise prejudice the due administration of justice.

B.  All counsel shall take reasonable precautions to prevent all persons who have been or are now participants in or associated with the investigations conducted by the prosecution and defense from making any statements or releasing any documents that are not in the public record and that are reasonably expected to be publicly disseminated which would be likely to materially prejudice the fairness of this criminal proceeding.

(10/23/2001 Order at 1–2.)  This stipulated Order was signed by counsel for the Government and for all Defendants who were then in the case, was promptly entered by the Court, and has remained in effect at all times from October 23, 2001 until the Court vacated it at the close of trial in June of 2003.

## B.  The Court's Efforts to Enforce the October 23, 2001 Order

Through their present motion, Defendants assert that the Attorney General has violated the October 23, 2001 Order on two occasions, first within a few days after its entry, and then again during the trial in the spring of 2003.  In addition, other incidents arose during the course of these proceedings that have implicated the terms of this Order, requiring the Court to convene conferences and correspond with counsel regarding these matters.

### 1.  The Attorney General's Reference to This Case at an October 31, 2001 Press Briefing

The first such incident occurred just eight days after the Order was entered, at a Washington, D.C. press briefing held by the Attorney General on October 31, 2001. At this news conference, the Attorney General gave a progress report on the "war on terror" that had been commenced following the September 11 attacks, announcing various steps that the Department of Justice had taken "to enhance our ability to protect the United States from the threat of terrorist aliens." (Government's Response, Ex. A, 10/31/2001 Briefing Tr. at 1.) These steps included the formation of a Foreign Terrorist Tracking Task Force, the implementation of measures authorized under the recently-enacted USA Patriot Act, and the designation of various groups as terrorist organizations under the Act. As a preface to his more specific remarks on these subjects, the Attorney General stated:

Forty years ago, the Department of Justice, under Attorney General Robert Kennedy, undertook an extraordinary law enforcement campaign to root out and to dismantle organized crime.  The Kennedy Justice Department, it is said, would arrest a mobster for spitting on the sidewalk, if it would aid in the war against organized crime.

In the war on terror, it is [the] policy of this Justice Department to be equally aggressive.  We will arrest and detain any suspected terrorist who has violated the law.  If suspects are found not to have links to terrorism or not to have violated the law, they'll be released. But terrorists who are in violation of the law will be convicted, in some cases be

deported, and in all cases be prevented from doing further harm to Americans.

Aggressive detention of lawbreakers and material witnesses is vital to preventing, disrupting, or delaying new attacks. It is difficult for a person in jail or under detention to murder innocent people or to aid or abet in terrorism.

Three Michigan men suspected of having knowledge of the September 11th attacks, for example, were arrested on charges of possessing false documents. In addition to a day planner containing notations in Arabic and what appeared to be a diagram of an airport flight line, agents found false immigration forms, a fraudulent U.S. visa and a false alien identification card in the apartment of the three men.

(*Id.*)

These statements about Defendants were prominently reported in both the local and the national media. Concerned that these remarks might violate the prohibition on prejudicial public communications about this case, the Court immediately convened a November 2, 2001 *in camera* off-the-record conference with the U.S. Attorney for this District, defense counsel, and then-Assistant Attorney General Michael Chertoff, the head of the Justice Department's Criminal Division. Through this measure, the Court sought to alert the Attorney General, the members of his staff, and all counsel of record in the case that the October 23, 2001 Order must be adhered to and would be strictly enforced. The Court also sought to swiftly rectify any prejudice to Defendants as a result of the Attorney General's comments and the ensuing publicity, by urging the Justice Department to immediately make clear that the Government lacked any evidence linking Defendants to the events of September 11. At the same time, the Court deemed it more appropriate at the time to address this matter in a non-public, off-the-record conference rather than a formal proceeding, in order to prevent this seemingly isolated incident from itself becoming a spectacle, and thereby diverting the attention and resources of the parties, counsel, and the Court away from the preparation of this case for trial.

During the course of this November 2, 2001 conference, Assistant Attorney General Chertoff stated that he understood the Court's concerns, apologized for any disruption in the proceedings as a result of the Attorney General's remarks, and represented that no further such incidents would occur during this case. The Court, in turn, instructed Mr. Chertoff to take steps to ensure that the Attorney General and his staff were fully apprised of the terms of the October 23, 2001 Order and the importance of avoiding any further public comments that might run afoul of this Order.

In addition, the Court addressed the potential prejudice to Defendants by urging Mr. Chertoff to pursue the release of a Justice Department statement specifically retracting the Attorney General's remark that Defendants were "suspected of having knowledge of the September 11th attacks." The Department issued a press release that very same day, stating that "[a]t this time the Department of Justice does not take the position that the three Michigan men had knowledge of the September 11 events." (Government's Response, Ex. B, 11/2/2001 DOJ Statement.)

2. **Events Surrounding the Return of the Second Superseding Indictment**

Over the next several months, there were no further disclosures or statements implicating the terms of the October 23, 2001 Order. During this time, the Government continued its investigation, and

indicated through counsel that it would soon determine whether to pursue a superseding indictment that would include terrorism-related charges. This process culminated in the Second Superseding Indictment, which was issued on August 28, 2002, and which charged for the first time that Defendants had provided material support or resources to terrorists.

Upon learning of this impending indictment and its terrorism-related charges,[4] the Court anticipated that there might be heightened media and public attention to this case, as well as increased demand for counsel to comment upon this development. Accordingly, on the morning of August 28, 2002, the date the indictment was expected to be (and ultimately was) handed down, the Court delivered to all counsel a letter reminding them of the obligations imposed under the October 23, 2001 Order:

> The Court has been advised by the Government that it will be seeking a superseding indictment today which will include terrorist-related charges. The Court has also been advised that the Government will be issuing a press release with the anticipated superseding indictment.
>
> In view of the "gag" order in place in this case—and in anticipation of a return of a superseding indictment—I instructed the Government to provide me with a copy of the proposed press release. I have now reviewed the press release to insure that it is purely descriptive of the charges in nature. No press conference is to be held in conjunction with a return of the superseding indictment or press release.
>
> Should the superseding indictment issue, I have also instructed the Govern-

ment to provide all defense lawyers with copies of the superseding indictment and press release prior to release to the media. In addition, I will permit defense counsel to respond to the media concerning the superseding indictment and press release in a limited, non-inflammatory manner.

> Under no circumstances should any attorney or party contact the media prior to any issuance of a superseding indictment by the Grand Jury.
>
> I instruct all counsel and parties to use restraint and caution in responding to media inquiries concerning the superseding indictment and the case in general, and remind counsel that, although I have permitted this limited media comment, the gag order remains in place.

(8/28/2002 Letter to Counsel at 1–2.)

Beyond attempting to anticipate and forestall any untoward public comment about the impending indictment and its terrorism-related charges, the Court's letter to counsel also was motivated by a specific and highly troubling incident. On the evening of August 27, 2002, the *day before* the grand jury handed down this indictment, a Fox television network news reporter announced a "breaking story" about the forthcoming indictment. Strikingly, this nationally televised report included language which was quite similar, if not identical, to the language of the Second Superseding Indictment issued the next day. Apart from the obvious implications to the October 23, 2001 Order, this apparent leak arguably violated Federal Rule of Criminal Procedure 6(e), which imposes strict secrecy requirements on grand jury proceedings.[5]

---

4. Specifically, the Assistant United States Attorney serving as the lead prosecutor in this case, Richard Convertino, contacted the Court in the afternoon of August 27, 2002, to

advise that the indictment likely would be issued the next day.

5. Notably, under subsection (e)(7) of this Rule, a "knowing violation of Rule 6 may be

But this was not all. The next evening, after the indictment had issued, a report aired on an MSNBC nightly news program regarding this case. During this program, an MSNBC news reporter read English translations of select, inflammatory portions of Arabic language tapes that had been seized in the initial raid of Defendants' apartment back on September 17, 2001. These translated passages had not been included in the indictment and, what is more, they were presented to the viewers as derived from the evidentiary record in this case. Although it is not clear whether the MSNBC reporter had gained access to the tapes actually seized from the apartment or the Government's translations of these tapes,[6] it was at least evident that the reporter had learned something about this case that was not a matter of public knowledge at the time—namely, that these tapes were among the items seized from Defendants' apartment on the date of their arrest.

Perhaps not surprisingly, given these leaks that apparently came from Government sources,[7] and in light of the serious terrorism-related charges contained in the Second Superseding Indictment, one of the defense attorneys elected to speak out to the local and national media in a fashion that did not comport with the Court's ad-

monition to "use restraint and caution" in public comments concerning the indictment.[8] This attorney stated to the Detroit media, for example, that the charges against his client were based on the "uncorroborated briefing of this snitch, [Youssef] Hmimssa," and that "[w]hat's kind of scary about this is that basically every Arab person in the country is one snitch away from being on the business end of a terrorism indictment." David Ashenfelter, *Prosecutors Seeking New Indictments Against Terror Suspects*, Detroit Free Press, Aug. 28, 2002 (quoting defense attorney Kevin Ernst). In an exercise of admirable professional restraint, however, the remaining defense attorneys refrained from offering any public comments in response to the outpouring of media and public interest surrounding the grand jury's return of terrorism-related charges.

Faced with this rash of apparent leaks and public statements concerning the charges and allegations of the Second Superseding Indictment, the Court convened an *in camera* telephonic hearing on October 7, 2002 with the two senior attorneys from the U.S. Attorney's Office for this District, defense counsel, and Deputy Attorney General Lawrence D. Thompson, who appeared on behalf of the Attorney

punished as a contempt of court." Fed. R.Crim.P. 6(e)(7).

6. Through the evidence introduced at trial, it appears that the tapes found in Defendants' apartment can be obtained without a great deal of effort in various Arabic-speaking communities.

7. There is no indication, the Court hastens to add, that these leaks originated in the Attorney General's Office. Nonetheless, both the nature and the substance of the leaks would tend to suggest that they are attributable to the Government rather than anyone associated with the defense. It also appears unlikely

that the local U.S. Attorney's Office was the source of the leaks, particularly given that the news reports regarding the Second Superseding Indictment and the Government's evidence originated with national reporters based in Washington.

8. This attorney subsequently withdrew from the case and was replaced by court-appointed counsel, but for reasons unrelated to the incidents surrounding the return of the Second Superseding Indictment. It is worth noting, however, that no further action has been sought or taken against this attorney regarding any violation of the Court's October 23, 2001 Order.

General's Office in Washington, D.C.[9] At this conference, the Court first recounted the incidents that had occurred to date regarding the October 23, 2001 Order. The Court then addressed the Deputy Attorney General, expressing its concern that "the message didn't get through" at the Court's prior, off-the record conference with then-Assistant Attorney General Chertoff. (10/7/2002 Conference Tr. at 12.) The Court further stated:

> [T]he reason why I wanted you [*i.e.,* Deputy Attorney General Thompson] to participate was because I know you are very much involved in the policy decisions here. And I'm not implying in any way [that] you are responsible for any of this. I want to quickly add that. But you seem to me to be the person, short of the Attorney General, who could make it clear to everybody in the [Justice] Department, that I view this with the greatest degree of seriousness. And to get that message through, not just to the lawyers and the prosecutors and the agents who are involved, but to the political people as well, because I don't believe they're getting the message.

> \*    \*    \*    \*    \*    \*

> Thus far, all I have done is talk[ ]. I've tried to make it clear to everybody that I view the gag order not only as important to the administration of this case, and to the parties here to ensure a fair trial, but I believe that it is in the best interest of all of the parties that this case be conducted in court through formal proceedings, hearings, conferences with the Court, motions, pleadings, and not tried in the media.

> We're heading into a stage in this case in which the[re]—I've got to make some very difficult decisions .... But one thing I have to be certain of, I have to

be able to trust counsel .... If I cannot, we will not be able to conduct this case.

> So, by virtue of this conference, I'm not doing this, as I said, as a formal order to show cause to anybody. But by virtue of this conference, I'm putting everybody on notice [that] there w[ill] be no violations. There are no free passes. And Mr. Deputy Attorney General, I hope you will pass that along. If the[re are] any more violations by the Government, ... I will impose sanctions, which may include a request to the Office of Professional Responsibility to investigate.

> I am determined not to make this a public spectacle, ... because I think that would not serve the overall purpose. Because if we do all this in public, then it raises the profile of the case and it becomes even harder to ensure a fair jury, not just here in Detroit, but anywhere .... I didn't initiate the gag order, but I intend to keep it in place until further order of the Court and I intend to enforce it.

(*Id.* at 12–16.)

In response to the Court's remarks, the Deputy Attorney General stated that he was "not aware of anyone, any employee of the [Justice] Department, being involved in any pre-indictment leak." (*Id.* at 17.) Nonetheless, Mr. Thompson assured the Court that he had read the October 23, 2001 Order, and that he would "bring [the Court's] concerns to the attention of the appropriate people here at the Department" and "make certain that we do everything we possibly can to bring to the attention [of] our employees the absolute[ ] necessity to not only obey all court orders, [but] make certain all defendants receive fair and just trials." (*Id.*) He further stated that he would confer with the senior

---

**9.** This hearing was on the record, but the transcript initially was placed under seal.

The transcript subsequently was unsealed by Order dated September 18, 2003.

officials in the local U.S. Attorney's Office "to make certain that we've explored all the possibilities in communicating your concerns, Your Honor, and court order to the appropriate people here at the DOJ who may deal with this case [or] who may have knowledge of this case." (*Id.* at 18.)

Following up on these assurances, the Court requested that the Deputy Attorney General address this matter in a memo "and make sure that this memo is confidentially given circulation, not just to the folks in the Criminal Division [of the Department of Justice], but anybody who is involved in this case and to the folks in the Attorney General's Office." (*Id.* at 21.) Deputy Attorney General Thompson agreed, and issued an October 16, 2002 memorandum to the Attorney General's Office and other Department of Justice entities discussing the issues addressed at the October 7, 2002 conference with the Court.[10] Specifically, this memo set forth the terms of the October 23, 2001 Order, noted that the Second Superseding Indictment apparently had been leaked the evening before it was handed down, and observed that "[t]his case has generated a substantial amount of interest, especially in the Detroit area." (10/16/2002 Thompson Memo at 1–2.) The memo closed with the directive that Department employees "avoid making any statement about this case except in strict compliance with the Court's order, applicable rules, and Department policy as set forth in Section 1–7.000 of the United States Attorneys' Manual." (*Id.* at 2.)

### 3. The Attorney General's Reference to a Government Witness During the Trial

Following this flurry of activity immediately surrounding the return of the Second Superseding Indictment, trial preparations proceeded over the next several months without public comment by counsel or the parties. A lengthy jury selection process began on February 21, 2003, when prospective jurors were summoned to the Court and asked to complete a detailed, 26–page questionnaire. Among other inquiries, prospective jurors were asked whether they had seen, heard, or read anything about Defendants or this case. If so, the jurors were asked whether what they had learned would prevent them from rendering a fair and impartial verdict based solely on the evidence presented in court.

The jury selection process continued in court on March 18, 2003, when prospective jurors were subjected to extensive individual *voir dire*. Again, some of this questioning concerned pretrial publicity. This lengthy and painstaking process continued for seven days, concluding on March 26, 2003 with the final selection of a panel of sixteen jurors and alternates. That same day, the trial formally began with the opening statements of the parties.

It is fair to characterize Youssef Hmimssa as one of the Government's key witnesses. Although Mr. Hmimssa was among the Defendants named in the initial indictment, the charges against him were severed because of his agreement to cooperate with the Government and testify against the other Defendants. In all, he testified for five days at trial, including three days of vigorous cross-examination. This testimony directly and specifically detailed various terrorism-related activities engaged in by each of the Defendants. Mr. Hmimssa concluded his testimony on

---

**10.** This memo, like the transcript of the October 7 conference, initially was filed under seal, but has since been unsealed.

April 17, 2003, just short of the midpoint of trial.

That same day, April 17, 2003, Attorney General Ashcroft held a press conference in Washington, D.C. to address the Justice Department's efforts to prevent any domestic acts of terrorism arising from the war in Iraq. During the course of his remarks, the Attorney General noted that various individuals had recently been charged with engaging in terrorism-related activities. The Attorney General then stated:

Also, during this same time, the Justice Department took guilty pleas from four individuals who are providing cooperation to the United States as part of their plea agreements. I want to emphasize the value of the guilty pleas with agreements to cooperate. The information in a guilty plea obviously assists us in detaining and disrupting the activities of those who are not associated with the plea. The person pleading guilty goes to jail, but the information helps us disrupt activities of others who are not a party to that particular litigation.

Ernest James Ujaama in Seattle pled guilty to providing goods and services to the Taliban.

Two defendants in Buffalo pleaded guilty for providing material support to al Qaeda.

And Youssef—I'm having trouble with this one—Youssef Hmimssa pled guilty to multiple criminal charges and is currently cooperating in the Detroit cell case. His testimony is—has been of value, substantial value, in that respect.

Our—such cooperation is a critical tool in our war against terrorism, and when those who may be contemplating terrorist activity are aware of the fact that there are others who had been involved in the terrorist network who are cooperating and providing information, we believe that is a destabilizing, disrupting influence on any who might be seeking to engage in terrorist acts.

(Government's Response, Ex. C, 4/17/2003 Press Conference Tr. at 3–4.) This press conference apparently was televised, and the Attorney General's comments about Youssef Hmimssa were widely reported in the Detroit media.

The following morning at trial, Defendants immediately moved for a mistrial, on the ground that the Attorney General had improperly attempted to bolster the credibility of a Government witness. Defense counsel further expressed the intention to seek an order to show cause why the Attorney General should not be held in contempt of Court, but no formal motion actually was made at the time.

In response to the motion for mistrial, the Court first addressed the jury regarding another, unrelated matter, and then questioned the jury as follows:

The second issue that I want to raise with the jury is—relates to my ongoing admonition to you not to read anything about the case, not to watch anything on television about the case, not to listen to anything on the radio about the case. My question to you is, in the last day or so, have any of you either heard directly, even though inadvertently, anything in the media or read anything in the paper about any government official commenting on any of the issues or any of the people or any of the witnesses involved in this case? Any government official whatsoever? Any of you heard anything in the radio, seen anything on television, read anything in the paper about any government official commenting about any of the issues in this case or any of the people or witnesses in this case?

(4/18/2003 Trial Tr. at 3641–42.) The jurors were asked to raise their hands if

their response was affirmative, and none did so. Both the Government and defense counsel were then offered an opportunity to conduct further *voir dire* on this matter, and neither side elected to do so. Based on the jury's response, the Court denied Defendants' motion for mistrial for lack of a showing of prejudice.

Regarding defense counsel's reference to the issue of contempt, the Court stated that any such motion by Defendants would be addressed following the trial. The Court then added:

> Suffice it to say, given all of the history here, ... I was distressed to see the Attorney General commenting in the middle of a trial about the credibility of a witness who has just gotten off the stand. I believe the Attorney General is subject to the orders of this Court, [and] I believe the Attorney General believes he's subject to the orders of this Court.
>
> ... [M]uch more concrete[ly], much more specific[ally], the Attorney General has been specifically put on notice about the Court's view of the scope of its gag order[ ][and] the Court's belief that the Attorney General is subject to the gag order[ ]. And the Court's specific indication to all Justice Department employees subject to the gag order, including the Attorney General, that they were not to comment on the merits or substantive issues involved in the case.
>
> I am concerned that the Attorney General's comment about the credibility of a witness in the middle of trial could potentially implicate the conditions of the gag order.
>
> I would only restate that which I've said many times before. The Court entered this gag order at the inception of the case at the request of the parties; all of the parties, including the Justice Department. I think it's worked, with some minor glitches, I think it's worked

to the benefit of all of the parties. Before the order was entered, I specifically asked all attorneys to review the terms of the gag order with all of their clients. I was advised that was done. I then did it, again, on a number of other occasions and I was advised that that was done. So I am concerned and distressed to wake up this morning to find the Attorney General commenting on the testimony of a witness that has appeared in this case during trial.

(4/18/03 Trial Tr. at 3635–37.)

Later that day, a Justice Department spokesperson addressed the Attorney General's remarks at his April 17 press conference. The spokesperson stated that "[t]his was a wide-ranging press conference discussing many different matters in the public record," and that "[w]e certainly had no intent to contravene the judge's wishes regarding publicity." David Ashenfelter, *Judge Wants Ashcroft Out of Terror Trial,* Detroit Free Press, April 19, 2003 (quoting a DOJ spokesperson).

Following this incident, the parties continued presenting their proofs for several more weeks, and counsel gave their closing arguments on May 20, 2003. The jury deliberated over seven days, and returned its verdict on June 3, 2003. One Defendant, Farouk Ali–Haimoud, was acquitted on all charges. A second, Ahmed Hannan, was convicted solely on a document fraud conspiracy charge. The two remaining Defendants, Karim Koubriti and Abdel–Ilah Elmardoudi, were convicted on both the document fraud conspiracy and terrorism-related charges.

## C. Procedural Background of the Present Motion

Defendants brought the present motion on August 28, 2003, requesting that the Attorney General be required to show cause why he should not be found to have

violated the Court's October 23, 2001 Order. Upon reviewing this submission, the Court issued an August 29, 2003 Order directing the Attorney General to address the threshold question whether he should be required to personally appear at a hearing on Defendants' motion. The Government responded to the Court's Order on September 12, 2003, arguing that the Attorney General should not be compelled to appear because, as a matter of law, he had not willfully disobeyed the October 23, 2001 Order as necessary to warrant contempt proceedings.[11] On September 22, 2003, Defendants filed a reply in further support of their motion.

On September 26, 2003, the Court held an *in camera*, off-the-record conference to address various issues raised by Defendants' motion. The U.S. Attorney for this District, his chief Assistant, and all defense counsel were present, as well as two very senior officials from the Attorney General's Office in Washington, D.C. This meeting was intended as an opportunity for those present to express their views on this sensitive and difficult matter with the greatest degree of candor, and to allow for a certain amount of "brainstorming" and open exchange as to the most appropriate way to proceed.

Although, as noted, the Government's response to Defendants' motion was not accompanied by any sort of statement from the Attorney General himself, the Attorney General has now personally addressed this matter in a November 26, 2003 letter to the Court.[12] This letter states:

With this letter, I hope to address the Court's concerns about two statements that I made over the past two years regarding *United States v. Koubriti*, et al. I write this not only as the Attorney General of the United States, but also as an officer of the court. The Department of Justice's legal position has been laid out in the brief that we filed with the Court on September 12, 2003, but I want personally to address your concerns.

This was, of course, a very important terrorism case for our nation and the Department of Justice, and as the Attorney General, I have a duty to keep the American people informed of the Department's progress against terrorism. Even so, I would certainly never want to do anything that could hinder a fair trial or jeopardize the convictions. Your initial Order, which was agreed to by all parties, instructed that persons associated with the case should not make statements about the case if there is a reasonable likelihood that such disclosure would interfere with a fair trial or otherwise prejudice the due administration of justice. In retrospect, I can appreciate how these two statements, however brief and passing, taken either individually or collectively could have been considered by the Court to be a breach of that part of the Court's Order. Let me assure you, however, that my remarks were entirely inadvertent. I had no intent either to disregard the Court's Order or to disrupt the ongoing trial proceedings, much less cause prejudice to the defendants. The statements at issue were unfortunately included during two of

11. Though the Court's August 29, 2003 Order called for a response from the Attorney General, the Government's response was submitted by the U.S. Attorney for this District, Jeffrey Collins. This submission was unaccompanied by any sort of affidavit or statement from the Attorney General himself.

12. This letter initially was filed under seal, with copies provided to all defense counsel. By Order issued on the date of this Opinion, the Attorney General's letter has been unsealed.

many press conferences in which I discussed the Department's extensive ongoing efforts in the war on terrorism. I regret making these statements, which resulted in a disruptive impact on the Court's management of the proceedings and had the effect of diverting the Court's and counsels' time and attention from other matters.

I appreciate the Court's painstaking efforts during trial and earlier during voir dire to ensure that no prejudice in fact resulted from the statements at issue. But even if, as set forth in the Department's brief, my remarks did not prejudice the defendants, or were not reasonably likely to do so, I made a mistake in making statements that could have been considered by the Court to be a breach of the Court's Order. And for that I apologize to the Court and counsel.

Please be assured that I have communicated to my staff our need to be more careful when including references to ongoing cases when drafting remarks. I take these matters very seriously and will make every effort to ensure that the difficulties occasioned in this instance will be avoided in the future.

(Attorney General 11/26/2003 Letter at 1–2.)

In response to this letter, defense counsel submitted a letter to the Court on December 9, 2003,[13] which states in part:

[I]t was the position of the defense in this matter that the Attorney General was and is personally responsible for his actions and that his earlier response to our motion was insufficient in that it was not a personal response. It was merely a pleading filed by a third party. Finally, it has been the position of the defendants that no one really knows whether

the jurors were completely candid about their exposure to the public comments by the Attorney General. While there was no actual harm discerned from the jurors in our interviews subsequent to the trial, certainly there was always the potential for harm that we should be concerned with as the case law provides.

A lawyer, who is bound by the rules of ethics and the Constitution of the United States, should know better than to comment on the testimony of a government witness while a trial is pending. In his personal letter to the Court, the Attorney General attempts to minimize the consequences of his actions. He attempts to deny his intent to interfere by characterizing his comments as inadvertent and, while he assures the Court that he takes these matters very seriously, he does not convince defense counsel that this conduct should not be addressed .... Further, to say that he believes that his comments were not reasonably likely to prejudice the defendants sends a message loud and clear that he does not understand the nature of his wrongful conduct or the gravamen of his offensive remarks.

The integrity of the system as a whole is at stake. Mr. Ashcroft's comments were widely reported, both on television and in the news media. They were available electronically and could very easily have been inadvertently discovered by one of the jurors in the case. More importantly, because of the broad coverage, it is extremely likely that jurors' families and friends would happen upon the improper comments and mention them to a juror in our case.

The Attorney General of the United States has many functions. His perceived function of informing the public conflicts with the defendants' right to a fair trial. How many other trials will

---

**13.** This letter also was initially filed under seal, but has now been unsealed.

there be during his tenure as the Attorney General? What has been learned? Counsel are not convinced that his apology is sufficient. Furthermore, counsel are not convinced that given the choice between his perceived duty to keep the American people informed, and an individual's right to a fair trial, that he would recognize his sacred obligation to insure that all defendants receive a fair trial without interference.

This Court has discretion as to whether or not to receive the Attorney General's letter as an acceptable response to our motion, and to determine whether his letter is sufficiently contrite and whether his apology is sufficient .... Obviously, the question of whether to take this matter further is within the discretion of the Court....

The defendants respectfully request three things if the Court were to make a decision at this time. First, that a finding be made that the Attorney General's conduct is subject to this Court's orders and that it was improper. Secondly, that there should be a finding that there was no superior duty on the part of an Attorney General that transcended the defendants' right to a fair trial. Finally, that Mr. Ashcroft be, in some fashion, sanctioned for his behavior.

(Defense Counsel 12/9/2003 Letter at 1–3.)

Having considered all of these facts, circumstances, and submissions, the Court now is prepared to rule on Defendants' motion. This Opinion and Order sets forth the Court's rulings.

### III. *ANALYSIS*

**A. The Law Governing Defendants' Motion**

In their motion, Defendants contend that the Attorney General's statements re-

garding this case at his October 31, 2001 and April 17, 2003 press briefings implicated two of the three subsections of the federal contempt statute, 18 U.S.C. § 401. This statute provides:

A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

18 U.S.C. § 401.[14] Because the Attorney General made his statements in Washington, D.C., subsection (1) does not apply here. *See Nye v. United States,* 313 U.S. 33, 48–52, 61 S.Ct. 810, 815–17, 85 L.Ed. 1172 (1941) (statutory requirement of misbehavior "in [the Court's] presence or so near thereto" connotes physical proximity). Defendants maintain, however, that subsection (2) is applicable by virtue of the Attorney General's status as an officer of the Court, and that subsection (3) is triggered by the Attorney General's purported violation of the October 23, 2001 Order.

As it happens, subsection (2) does not apply here. Admittedly, attorneys often are characterized as "officers of the court"—and, indeed, the Attorney General himself stated in his November 26, 2003 letter in this case that he was writing "as an officer of the court." Yet, in a decision directly construing the language of § 401(2), the Supreme Court held that the

---

**14.** This statute was amended on November 2, 2002 to insert the "or both" language follow-

ing "fine or imprisonment." This amendment is not material here, however.

term "officers" as used in this provision is limited to "the group of persons who serve as conventional court officers and are regularly treated as such in the laws." *Cammer v. United States,* 350 U.S. 399, 405, 76 S.Ct. 456, 459, 100 L.Ed. 474 (1956). In so ruling, the Court cited the range of federal statutes governing traditional court officers and employees, *see Cammer,* 350 U.S. at 405, 76 S.Ct. at 459 (citing 28 U.S.C. §§ 601–963), statutes which do not encompass attorneys appearing before a court. Accordingly, the Court concluded that lawyers are not court "officers" within the reach of § 401(2). *Cammer,* 350 U.S. at 407–08, 76 S.Ct. at 460; *see also United States v. Griffin,* 84 F.3d 820, 832 n. 8 (7th Cir.1996); *United States v. Time,* 21 F.3d 635, 641 (5th Cir.1994); *In re Holloway,* 995 F.2d 1080, 1081–82 (D.C.Cir.1993), *cert. denied,* 511 U.S. 1030, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994); *Taberer v. Armstrong World Industries, Inc.,* 954 F.2d 888, 897 n. 10 (3d Cir.1992).[15]

▮ This leaves only subsection (3) of the contempt statute, which authorizes the Court to punish "[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401(3). By its express terms, this provision is triggered only by "disobedience or resistance" to a court's order. *See In re Smothers,* 322 F.3d 438, 441 (6th Cir.2003). This act of disobedience or resistance must be willful—that is, a "deliberate or intended violation" of the court's order, "as distinguished from an accidental, inadvertent or negligent violation." *Smothers,* 322 F.3d at 442 (internal quotations and citations omitted). In addition, the court's order must be reasonably definite and specific, and the alleged violator must have been on notice of this directive. *See Downey v. Clauder,* 30 F.3d 681, 686 (6th Cir.1994); *United States v. Cutler,* 58 F.3d 825, 834 (2d Cir.1995); *United States v. West,* 21 F.3d 607, 609 (5th Cir.1994).

Though § 401(3) and the relevant case law define the substantive legal standards with reasonable clarity, procedural considerations introduce an additional level of complexity to the present matter. In particular, a contempt proceeding under § 401 may be either criminal or civil in nature, and the required procedures are markedly different depending on this "civil" versus "criminal" determination. *See Downey,* 30 F.3d at 685–86. The Supreme Court has explained:

"Criminal contempt is a crime in the ordinary sense," *Bloom v. Illinois,* 391 U.S. 194, 201, 88 S.Ct. 1477, 1481, 20 L.Ed.2d 522 (1968), and "criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings," *Hicks v. Feiock,* 485 U.S. 624, 632, 108 S.Ct. 1423, 1429–1430, 99 L.Ed.2d 721 (1988). See *In re Bradley,* 318 U.S. 50, 63 S.Ct. 470, 87 L.Ed. 608 (1943) (double jeopardy); *Cooke v. United States,* 267 U.S. 517, 537, 45 S.Ct. 390, 395, 69 L.Ed. 767 (1925) (rights to notice of charges, assistance of counsel, summary process, and to present a defense); *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 444, 31 S.Ct. 492, 499, 55 L.Ed. 797 (1911) (privilege against self-incrimination, right to proof beyond a reasonable doubt). For "serious" criminal contempts involving imprisonment of more than six months, these protections in-

---

**15.** These rulings rest purely on grounds of statutory construction, and are limited to the term "officers" as used in § 401(2). As such, these decisions do not reflect any broader notion that attorneys cannot be considered "officers of the court" for other purposes. In particular, as discussed below, the Attorney General's characterization of himself as an "officer of the court" in his November 26, 2003 letter has evidentiary significance here.

clude the right to jury trial. *Bloom,* 391 U.S., at 199, 88 S.Ct., at 1481, see also *Taylor v. Hayes,* 418 U.S. 488, 495, 94 S.Ct. 2697, 2701–2702, 41 L.Ed.2d 897 (1974). In contrast, civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is required.

*International Union, United Mine Workers of America v. Bagwell,* 512 U.S. 821, 826–27, 114 S.Ct. 2552, 2556–57, 129 L.Ed.2d 642 (1994) (footnote omitted).[16]

As *Bagwell* acknowledges, "[a]lthough the procedural contours of the two forms of contempt are well established, the distinguishing characteristics of civil versus criminal contempts are somewhat less clear." *Bagwell,* 512 U.S. at 827, 114 S.Ct. at 2557 (footnote omitted). The Sixth Circuit has provided some guidance on this topic, stating:

> The distinction between civil and criminal contempt lies in the purpose of the court's mandate. Civil contempt sanctions are designed to enforce compliance with court orders and to compensate injured parties for losses sustained. Criminal contempt sanctions, on the other hand, are imposed to vindicate the authority of the court by punishing past acts of disobedience. Accordingly, a fine that is payable to the complainant as compensation for damages caused by the contemnor's noncompliance or that is contingent upon performing the act required by the court's order is civil in nature, while an unconditionally payable fine is criminal.

*Downey,* 30 F.3d at 685 (internal quotations and citations omitted).

Similarly, *Bagwell* observes that imprisonment imposed as a contempt sanction is coercive, and hence civil, where "the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus carries the keys of his prison in his own pocket." *Bagwell,* 512 U.S. at 828, 114 S.Ct. at 2558 (internal quotations and citations omitted). "By contrast, a fixed sentence of imprisonment is punitive and criminal if it is imposed retrospectively for a completed act of disobedience, such that the contemnor cannot avoid or abbreviate the confinement through later compliance." *Bagwell,* 512 U.S. at 828–29, 114 S.Ct. at 2558 (internal quotations and citation omitted).

Here, any sanction potentially faced by the Attorney General under § 401(3) plainly must be characterized as criminal rather than civil. The trial in this case having already concluded, any sanction would not be designed to ensure future compliance with the Court's orders. Nor is there any way, under the circumstances, to meaningfully "compensate" the parties for any "losses" that might have been incurred as a result of the Attorney General's conduct. Rather, any sanction imposed at this juncture would be wholly punitive in nature, designed to "vindicate the authority of the court by punishing past acts of disobedience." *Downey,* 30 F.3d at 685. Moreover, if it were determined that punishment was warranted under § 401(3), the Attorney General could do nothing at this

---

**16.** In a footnote, the Court explained that it was addressing "only the procedures required for adjudication of indirect contempts, *i.e.,* those occurring out of court," in contrast to "direct" contempts that "may be immediately adjudged and sanctioned summarily." *Bagwell,* 512 U.S. at 827 n. 2, 114 S.Ct. at 2557 n. 2. In this case, likewise, the conduct at issue occurred out of court, so that the standards of "indirect contempt" apply.

point to "cure" any past violation and avoid this result.

Because any contempt proceeding would be criminal in nature, the process would be governed by Federal Rule of Criminal Procedure 42(a). This Rule provides:

(a) **Disposition After Notice.** Any person who commits criminal contempt may be punished for that contempt after prosecution on notice.

(1) **Notice.** The court must give the person notice in open court, in an order to show cause, or in an arrest order. The notice must:

(A) state the time and place of the trial;

(B) allow the defendant a reasonable time to prepare a defense; and

(C) state the essential facts constituting the charged criminal contempt and describe it as such.

(2) **Appointing a Prosecutor.** The court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney. If the government declines the request, the court must appoint another attorney to prosecute the contempt.

(3) **Trial and Disposition.** A person being prosecuted for criminal contempt is entitled to a jury trial in any case in which federal law so provides and must be released or detained as Rule 46 provides. If the criminal contempt involves disrespect toward or criticism of a judge, that judge is disqualified from presiding at the contempt trial or hearing unless the defendant consents. Upon a finding or verdict of guilty, the court must impose the punishment.

Fed.R.Crim.P. 42(a). In addition, as noted earlier, the traditional protections attendant to criminal charges would apply, such as the privilege against self-incrimination and the right to proof beyond a reasonable doubt. With these standards in mind, the Court turns to Defendants' motion.

**B. The Court Finds an Insufficient Basis for Charging the Attorney General with Criminal Contempt of Court.**

As is evident from the foregoing discussion of the applicable law, a criminal contempt proceeding is an intricate and rigorous process, governed by the stringent procedures demanded in our system of justice in order to charge and convict a defendant. Where the potential defendant is the United States Attorney General, the Nation's highest law enforcement official, this process becomes considerably more complex, implicating such core constitutional concerns as the separation of powers between the judicial and executive branches. Nonetheless, the Court's duties and inquiries remain the same, and necessarily cannot vary with the station of the individual involved. Upon applying the relevant criminal contempt standards here, the Court concludes that while the Attorney General's statements about this case constituted violations of the October 23, 2001 Order, the record lacks evidence of willfulness that might warrant contempt charges against the Attorney General.

As stated earlier, a contempt charge under § 401(3) requires proof of a willful violation of a reasonably definite and specific court order. The order at issue here, of course, is the Court's October 23, 2001 Order regulating counsel's public communications about the case. Specifically, this Order prohibited the "release of information or opinion about this criminal proceeding which a reasonable person would expect to be disseminated by any means of public communication, if there is a reasonable likelihood that such disclosure will

interfere with a fair trial of the pending charges or otherwise prejudice the due administration of justice." The question before the Court, then, is whether the Attorney General's statements at his October 31, 2001 and April 17, 2003 press briefings concerning matters related to this case constituted willful violations of the October 23, 2001 Order. This inquiry, in turn, has three separate parts: (1) Was the Court's Order reasonably definite and specific? (2) Did the Attorney General's comments, either individually or collectively, constitute a violation of this Order? and (3) Was any violation of the Order willful? The Court addresses each of these points in turn.

### 1. The Court's Order Was Reasonably Definite and Specific.

As a threshold matter, the Court readily concludes that its October 23, 2001 Order was sufficiently definite and specific to sustain a contempt charge under § 401(3). The "reasonable likelihood of prejudice" standard set forth in the Order precisely tracks the language of Disciplinary Rule 7-107 of the American Bar Association's Model Code of Professional Responsibility,

the precursor to the ABA's Model Rules of Professional Conduct. Several states have adopted this standard for regulating the public statements of attorneys about pending cases in which they appear,[17] and at least two Courts of Appeals have held that this standard passes constitutional muster. *See In re Morrissey,* 168 F.3d 134, 139–40 (4th Cir.), *cert. denied,* 527 U.S. 1036, 119 S.Ct. 2394, 144 L.Ed.2d 794 (1999); *Cutler, supra,* 58 F.3d at 835–36.[18] Thus, there is nothing inherently unfamiliar or indefinite in the Court's instruction to refrain from public statements that bear a "reasonable likelihood" of prejudice.

More importantly, the **parties themselves,** both the Government and Defendants alike, proposed the language contained in the October 23, 2001 Order. Then, having offered this language, counsel for the Government and Defendants alike expressly stipulated to the entry of this Order. As set forth earlier, and as further addressed below, the Court and counsel discussed the Order on a number of occasions, with the Court clearly expressing its views as to the sorts of communications that were permissible and

---

**17.** At the time of the Supreme Court's decision in *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1068 n. 2, 111 S.Ct. 2720, 2741 n. 2, 115 L.Ed.2d 888 (1991), eleven states had adopted this standard.

**18.** In *Gentile,* 501 U.S. at 1075–76, 111 S.Ct. at 2745, the Supreme Court upheld the constitutionality of the "substantial likelihood of material prejudice" standard set forth in Rule 3.6 of the ABA's Model Rules of Professional Conduct. This same prohibition appears in Rule 3.6 of the Michigan Rules of Professional Conduct, and thus would be applicable here even in the absence of the October 23, 2001 Order. *See* Local Rules 1.1(c), 83.22(b), U.S. District Court for the Eastern District of Michigan (providing that the Michigan Rules of Professional Conduct apply to attorneys who practice in this District, whether in civil or criminal cases).

The Sixth Circuit has not yet decided whether the "reasonable likelihood of prejudice" standard survives First Amendment scrutiny. In *United States v. Ford,* 830 F.2d 596 (6th Cir.1987), however, the Court struck down a gag order that prohibited the defendant himself, as well as counsel, from making any public statements whatsoever about the case, beyond a bare assertion of innocence. In so ruling, the Court indicated that only a showing of a "clear and present danger" would warrant such a broad prohibition against a defendant discussing the charges against him. *See Ford,* 830 F.2d at 598–600. The Sixth Circuit has not yet revisited this decision in light of *Gentile*'s holding that the "substantial likelihood of material prejudice" standard is constitutionally permissible.

prohibited. Throughout all of this, the Government has never once indicated any uncertainty about the obligations imposed under the Order, not even in response to Defendants' present motion. Nor does the Government challenge the Order as an unconstitutional restraint upon the Attorney General's duty to communicate with the public regarding matters of executive policy. Under these circumstances, indefiniteness provides no defense, and the Government does not contend otherwise.

### 2. The Attorney General's Statements About the Case Violated the Court's Order.

The next question, therefore, is whether the Attorney General violated the October 23, 2001 Order in his two public statements about this case. As an initial matter, the Court observes that the Attorney General himself conceded, in his November 26, 2003 letter to the Court, that "[i]n retrospect" he could "appreciate how these two statements, however brief and passing, taken either individually or collectively could have been considered by the Court to be a breach of ... the Court's Order." (Attorney General 11/26/2003 Letter at 1.) While this may not constitute an express admission that the statements violated the Order, it nonetheless is a direct acknowledgment of the potentially violative and prejudicial effect of these statements. Beyond the Attorney General's own acknowledgment, moreover, additional considerations compel the Court to conclude that its Order was violated.

Specifically, beginning with the October 31, 2001 press briefing, the Attorney General stated on this occasion that the three Defendants arrested on September 17, 2001 were "suspected of having knowledge of the September 11th attacks." As the Government now concedes, this remark "was unfortunately mistaken." (Government's Response at 11.) The Government has never alleged or produced any evidence that Defendants had any involvement with or knowledge of the September 11 terrorist attacks, and the Department of Justice issued a retraction to this effect shortly after the Attorney General made this comment.

There is ample basis to conclude that this statement violated the October 23, 2001 Order. One can scarcely imagine a stronger condemnation than association with the worst attack ever perpetrated on U.S. soil. This was all the more true at the time of the Attorney General's remarks, just over a month after the tragic events of September 11. To misstate the Government's allegations and evidence on such a highly-charged and emotional issue surely was "reasonabl[y] likel[y]" to "interfere with a fair trial of the pending charges or otherwise prejudice the due administration of justice" in this case. Indeed, in listing examples of disclosures that are "more likely than not to have a material prejudicial effect on a proceeding," the commentary to the ABA Model Rules cites the public release of information "that the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and that would, if disclosed, create a substantial risk of prejudicing an impartial trial." ABA Model Rules of Professional Conduct, Rule 3.6, cmt. 5.

In arguing that there was no violation, the Government points out (i) that the Attorney General's statement was a passing remark made during the course of a lengthy press briefing, (ii) that this incident occurred nearly 18 months before trial, and (iii) that the Department of Justice issued a retraction just two days later. Viewed in this larger context, the Government contends that the danger of prejudice was minimal. As proof of this, the

Government notes that the extensive individual jury *voir dire* before trial failed to disclose any actual prejudice—each juror who was selected professed an ability to distinguish between the September 11 attacks and the charges in this case, and none reported having been influenced by any erroneous statement or allegation regarding Defendants' purported knowledge of the attacks. As the Government observes, "evidence that the [attorney]-generated publicity did not in fact taint the jury pool may be relevant to the issue whether those statements were likely to interfere with a fair trial." *Cutler,* 58 F.3d at 836 (citing *Gentile,* 501 U.S. at 1047, 111 S.Ct. at 2730 (Kennedy, J., dissenting in part)).

Yet, *Gentile* and its progeny cut as much *against* the Government's position as for it. Both Chief Justice Rehnquist and Justice Kennedy recognized, for example, that statements made "well in advance of trial" pose less of a danger of prejudice. *Gentile,* 501 U.S. at 1079, 111 S.Ct. at 2747 (Rehnquist, C.J., dissenting in part); 501 U.S. at 1044, 111 S.Ct. at 2729 (Kennedy, J., dissenting in part). But their separate opinions *also* observed that "damaging" and "highly inflammatory" statements are not so readily cured through the passage of time. 501 U.S. at 1044, 111 S.Ct. at 2729 (Kennedy, J., dissenting in part); 501 U.S. at 1079, 111 S.Ct. at 2747 (Rehnquist, C.J., dissenting in part). As noted, it is difficult to envision a statement more damaging or inflammatory than one which links a criminal defendant to the events of September 11.

Moreover, a statement made even in the early stages of a criminal proceeding can still be quite prejudicial if, for example, it is "timed to have maximum impact, when public interest in the case [i]s at its height immediately after [the defendant] [i]s indicted." *Gentile,* 501 U.S. at 1079, 111

S.Ct. at 2747 (Rehnquist, C.J., dissenting in part); *see also Cutler,* 58 F.3d at 837. A prompt retraction would not necessarily cure this prejudice, because the impact of pretrial publicity "must be judged at the time a statement is made." *Gentile,* 501 U.S. at 1047, 111 S.Ct. at 2730 (Kennedy, J., dissenting in part); *see also Cutler,* 58 F.3d at 836. Here, the Attorney General's initial statement was made shortly after Defendants were indicted, and in the immediate aftermath of September 11 when public anxiety and demands for swift justice were at their height. Though the Justice Department is to be commended for its prompt retraction, it is not self-evident that the Department's clarifying statement was as widely distributed and reported as the Attorney General's initial remarks, so that any danger of prejudice was quickly and thoroughly dispelled.

Consequently, the Court finds that the Attorney General's statement at the October 31, 2001 press briefing violated the Court's October 23, 2001 Order. Although it appeared that this statement had been forgotten by the time of trial, and although the extensive *voir dire* revealed no actual prejudice to Defendants' right to a fair trial, the Court cannot help but conclude that an unfounded statement linking an individual of Middle Eastern origin to the September 11 attacks is reasonably likely to prejudice this individual's subsequent criminal trial. Indeed, everyone involved in this case recognized the prejudicial effect of such a link, and one of the principal aims of *voir dire* was to ensure that jurors did not unfairly associate Defendants with the attacks on New York and Washington, D.C. While this line of inquiry undoubtedly would have been pursued even in the absence of any statement suggesting such a connection, this merely highlights the importance, under the circumstances presented here, of avoiding any remarks that might exacerbate this known concern.

The surrounding context, in short, heightened rather than reduced the likelihood that the Attorney General's statement might interfere with a fair trial.

Turning to the Attorney General's second statement regarding this case, this occurred on April 17, 2003, in the fourth week of an eleven-week trial. That same day, one of the Government's key witnesses, Youssef Hmimssa, had just concluded his fifth and final day of testimony. At a Washington, D.C. press conference, the Attorney General cited Mr. Hmimssa as one of several examples of cooperating witnesses who had provided assistance in the Government's war on terror. Specifically, the Attorney General noted that Hmimssa had "pled guilty to multiple criminal charges and [wa]s currently cooperating in the Detroit cell case," and he stated that Hmimssa's "testimony is—has been of value, substantial value, in that respect."

The Court finds that these April 17, 2003 remarks, like the statements at the October 31, 2001 press briefing, violated the October 23, 2001 Order. Notably, the Attorney General's more recent statement, like his earlier one, falls within a category of disclosures deemed "more likely than not to have a material prejudicial effect" in the commentary accompanying the ABA Model Rules. *See* ABA Model Rules of Professional Conduct, Rule 3.6, cmt. 5 (citing statements relating to "the character, credibility, [or] reputation ... of a party, suspect in a criminal investigation or witness" as potentially problematic). The witness in question here, Youssef Hmimssa, was a focal point of the Government's case, and he had just stepped down from the witness stand at the time the Attorney General referred to him. Moreover, it is perhaps an understatement to say that Mr. Hmimssa's credibility was at issue, with defense counsel having just concluded

three days of vigorous cross-examination. Against this backdrop, the Attorney General's statement that Hmimssa's "testimony ... has been of value, substantial value," plainly was "reasonabl[y] likel[y]" to "interfere with a fair trial of the pending charges or otherwise prejudice the due administration of justice."

In maintaining otherwise, the Government cites many of the same factors addressed above with regard to the October 31, 2001 statement. The Government again notes, for example, that the Attorney General's brief reference to this case was only a small part of a lengthy press conference addressing a myriad of subjects related to the war on terror. The Government further points to the clarification offered by a Justice Department spokesperson the very next day, stating that "[w]e certainly had no intent to contravene the judge's wishes regarding publicity." Moreover, there was little danger, in the Government's view, that Defendants' fair trial rights would actually be prejudiced, in light of the Court's repeated and strict instruction that the jurors were to avoid reading or viewing any reports or statements about the case. Finally, the Government argues that the statement itself did not reflect any attempt to bolster the credibility of a witness, but rather was a more general observation about the valuable role of cooperating individuals in the war on terror.

Addressing the last of these points first, the Court fails to see how a potentially innocent interpretation renders the Attorney General's statement any less violative of the October 23, 2001 Order. It is perhaps possible that this statement, viewed in the context of the Attorney General's broader discussion about the importance of persons who agree to cooperate, could be construed as highlighting the "substantial value" of Youssef Hmimssa's cooperation,

versus the testimony itself. It is also true, as the Government points out, that the Attorney General's remarks fall short of the "blunt comments" cited by the Sixth Circuit as instances of improper vouching—a statement by a prosecutor, for example, that "I think he [the witness] was candid" and "I think he is honest." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir.1999) (internal quotations and citation omitted).

Yet, there is no escaping the brute fact that the Attorney General expressly referred to Youssef Hmimssa's *testimony* as having "substantial value," and that this remark immediately followed the observation that Hmimssa was "currently cooperating" *in this case.* Surely, Hmimssa's testimony would not be of "substantial value" to the Government if the Attorney General did not deem it to be credible. Just as clearly, this testimony would not be of "substantial value" to the Government's efforts in this case unless the jury elected to credit it—and, significantly, the jury had not yet commenced its deliberations. This sort of statement, then, comes quite close to the second form of improper vouching identified in *Francis*—namely, "comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *Francis*, 170 F.3d at 550. Consequently, even assuming that the Attorney General's statement could be given a less problematic interpretation, it is equally or far more likely that it could be construed quite literally as an expression of the "substantial value" of the testimony of a key Government witness in a pending trial. This very real prospect of mischief, in the Court's view, is more than sufficient to trigger the "reasonable likelihood of prejudice" prohibition set forth in the October 23, 2001 Order.

The Government's remaining points require little further discussion. First, it is evident that even a brief remark can violate the October 23, 2001 Order, so long as it addresses a subject of significance that is "reasonabl[y] likel[y]" to result in prejudice. Surely, one such topic is the credibility of one of the Government's principal witnesses. Next, the Court again observes that a retraction, however laudable, does not completely remove the taint of prejudice posed by the initial statement. In any event, the "retraction" in this instance did not retreat from the earlier assertion that Hmimssa's testimony had been of "substantial value," but instead addressed the distinct matter of the Attorney General's intent in making his statement.

Further, by instructing the jurors that they were to avoid any reports about the case, the Court hardly granted a "free pass" for attorneys to say anything they wished, under the premise that jurors were unlikely to hear it. The Court did not, in other words, suspend the operation of the October 23, 2001 Order during the trial, and the Government cannot plausibly maintain that the need for the Order or the risk of prejudice was in any way reduced during this period. In fact, the Court was required to *voir dire* the jurors to determine if any of them had heard the Attorney General's comments. This, in itself, plainly demonstrates that these remarks had the potential to prejudice Defendants' fair trial rights. The fortuity that the jurors did not hear them does nothing to alter this conclusion.[19]

---

**19.** The Court notes that the Attorney General's remarks created an additional potential for mischief. The trial had been going on for some time, and would continue for several more weeks. If any juror had been looking for an excuse to be dismissed, the Attorney General's statement would have provided this opportunity. Fortunately, the jurors served

Finally, the Court cannot help but observe that, even in the absence of the October 23, 2001 Order regulating public statements about the case, any experienced trial lawyer should know that it is inappropriate to comment publicly about the credibility of a witness during a trial. For the reasons already discussed, such a public statement is fraught with risk to the fairness and integrity to the proceedings. Accordingly, on all of these grounds, the Court finds that its Order was violated through the Attorney General's public statement about this case on April 17, 2003.

### 3. The Record Does Not Support a Finding of Willfulness.

Having found that the Attorney General's two public statements about this case violated the October 23, 2001 Order, the Court next must consider whether either of these violations was willful. As noted earlier, this element is satisfied only through a "deliberate or intended violation" of the Court's Order, "as distinguished from an accidental, inadvertent or negligent violation." *Smothers*, 322 F.3d at 442 (internal quotations and citations omitted). In his November 26, 2003 letter to the Court, the Attorney General states that his remarks were "entirely inadvertent," and that he "made a mistake" for which he "apologize[d] to the Court and counsel." The Attorney General further states that he "had no intent either to disregard the Court's Order or to disrupt the ongoing trial proceedings." The Court accepts the Attorney General's characterization of his remarks as inadvertent, and this in itself negates the criminal intent necessary to sustain a contempt charge. *See Smothers*, 322 F.3d at 442; *Chandler*, 906 F.2d at 250. Moreover, the statements themselves and their surrounding

admirably in this regard, as they did through-

circumstances persuade the Court that the Attorney General did not willfully violate the Order.

█ With respect to the first violation, the Attorney General's October 31, 2001 statement bears all of the hallmarks of inadvertence rather than willfulness. The Attorney General referred to Defendants in a single, isolated remark made during a lengthy press conference addressing the Justice Department's various efforts in the war on terror. This is a far cry from the repeated and flagrant abuses that the courts have deemed sufficient to establish willfulness beyond a reasonable doubt, as necessary to sustain a conviction for criminal contempt. *See, e.g., Cutler*, 58 F.3d at 837 (upholding the criminal contempt conviction of an attorney who "persistent[ly] attempt[ed] to try [his] case in the media, despite [the judge's] repeated warnings," and who directly addressed "prospective veniremen" in some of his public remarks); *In re Levine*, 27 F.3d 594, 596–97 (D.C.Cir. 1994) (affirming a criminal contempt citation where an attorney repeatedly sought to elicit testimony regarding a document that the court had ruled inadmissible on several occasions, and where he exhibited "wholesale disobedience" to the court's orders), *cert. denied*, 514 U.S. 1015, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995).

Nor is this an instance where the context of a statement is suggestive of an improper motive. Viewed as a whole, the Attorney General's press briefing, coming shortly after September 11, served the important and wholly legitimate purpose of keeping the American public informed about the latest developments in the war on terror. A limited reference to this case would have been entirely appropriate to, and fully consistent with, this objective. Indeed, if the Attorney General had con-

out the lengthy and difficult trial.

fined his remarks to the allegations of the indictment, there would have been no violation whatsoever of the October 23, 2001 Order, much less a willful one. *See* ABA Model Rules of Professional Conduct, Rule 3.6(b) (providing that lawyers may state "the claim ... involved" in a proceeding and "information contained in a public record"). Again, this case is distinguishable in this respect from *Cutler*, for example, where the attorney purposefully selected speaking fora that would enable him to reach prospective jurors. *See Cutler*, 58 F.3d at 828–31, 837.

The timing of the Attorney General's statement also militates against a finding of willfulness, albeit not for the reasons suggested by the Government. This statement was made on October 31, 2001, just eight days after the Court entered its Order governing public communications about the case. Although the Government and Defendants alike stipulated to the entry of this Order, and while it might well be presumed that Justice Department officials in Washington, D.C. provided some input in counsel's drafting of the proposed language of the Order, it cannot be said with any degree of certainty that the Attorney General himself or members of his immediate staff were immediately aware, within a few short days, of the entry and terms of the October 23, 2001 Order. Any such lack of awareness and focus would have been particularly understandable under the circumstances, where the Nation was still reeling from the shock of September 11, and where the Department of Justice had just begun to assume its role in the administration's comprehensive and far-reaching war on terror.

Absent direct notice of a court's order, there can be no willful violation under § 401(3). *See Cutler*, 58 F.3d at 834. It was for precisely this reason, among others, that the Court elected to address the Attorney General's October 31, 2001 statement somewhat informally, through an off-the-record *in camera* conference with trial counsel and a representative of the Attorney General's Office in Washington, D.C. The Court was unwilling to assume at that point that its Order had been disseminated throughout all levels of the Justice Department, and that the Attorney General had made his statement despite his knowledge of this Order. Rather, the Court assumed just the opposite and, by means of this conference, took steps to ensure that all relevant DOJ officials were promptly informed of their obligations under the October 23, 2001 Order. To be sure, Government officials, including the Attorney General, are not automatically granted "one free bite" as to any court order, simply by virtue of their position and the logistical demands of broadly disseminating the order. Nonetheless, the Court believes that this is an appropriate consideration in assessing the willfulness of the Attorney General's violation.

This is all the more true under the exceptional circumstances that existed at the time of the Attorney General's initial public statement about this case. The Court fully appreciates, in particular, that the Attorney General faced a number of very serious challenges and demands in the immediate wake of September 11, a singularly traumatic time in our Nation's history. During this period, it seems safe to assume that the Attorney General's attention was focused on other, more immediately pressing matters of national concern. As the Court discusses at greater length below, these demands upon the Attorney General make it imperative that he employ, and rely upon, professional staff who are specifically attuned to the developments and details of ongoing cases and criminal investigations, and who can prevent the sort of mistake that was made here. These flaws in procedure or staff

oversight, however, do not reflect a willful violation.

Further, while the Justice Department's prompt retraction of the October 31, 2001 statement has only a modest impact on the "likelihood of prejudice" inquiry, it is considerably more relevant to the issue of willfulness. Such a retraction, in particular, is flatly inconsistent with any deliberate purpose to violate the Court's Order by poisoning the well of public opinion. To the contrary, it indicates that the Attorney General's Office recognized its error and acted quickly to correct it. For all of these reasons, then, the Court finds that the evidentiary record points decisively toward the conclusion that the Attorney General's first public comment about this case was an inadvertent rather than willful violation of the Court's Order.

■ This leaves the question whether the Attorney General's second statement about this case constituted a willful violation. Though it is a closer question than with the first statement, the Court again finds insufficient evidence that this more recent violation was willful. Once again, the direct evidence in the record uniformly attests to inadvertence rather than wilfulness. As noted, a Justice Department spokesperson stated the day after the Attorney General's April 17, 2003 remarks that "[w]e certainly had no intent to contravene the judge's wishes regarding publicity." Next, and more specifically, the Attorney General's November 26, 2003 letter to the Court states that "my remarks were entirely inadvertent," and that "I had no intent either to disregard the Court's Order or to disrupt the ongoing trial proceedings, much less cause prejudice to the defendants."

In contrast to the first violation, however, it cannot be said that the surrounding circumstances uniformly support this claim of inadvertence. Most significantly, while the Attorney General and his staff perhaps were personally unaware of the October 23, 2001 Order at the time of the press briefing held just eight days later, the same cannot be said as of the time of the Attorney General's most recent remarks. In the interim, senior Justice Department officials had been summoned on *two separate occasions* to *in camera* conferences with the Court, and were expressly advised in both instances about the terms of the October 23, 2001 Order and the Court's view that the Attorney General and his staff were bound by these terms. The second of these conferences was on the record, and Deputy Attorney General Lawrence D. Thompson assured the Court that he would "bring your concerns to the attention of the appropriate people" in the Justice Department, and that "we'll make certain that we do everything we possibly can to bring to the attention [of] our employees the absolute[ ] necessity to not only obey all court orders, [but] make certain all defendants receive fair and just trials." (10/7/2002 Conference Tr. at 17.) Then, immediately after this conference, the Deputy Attorney General circulated an October 16, 2002 memo to the Attorney General's Office, among other Justice Department divisions, setting forth the terms of the October 23, 2001 Order and instructing all Department employees to "avoid making any statement about this case except in strict compliance with the Court's order, applicable rules, and Department policy." (10/16/2002 Thompson Memo at 2.) Consequently, the Court has little doubt that the Attorney General and his staff were fully aware of the October 23, 2001 Order at the time of the April 17, 2003 press conference—and, to their credit, neither the Government nor the Attorney General contends otherwise in their recent submissions.

Nor, with the passage of over 18 months' time, can the Government as readily appeal to the extraordinary and immensely challenging circumstances in the immediate aftermath of September 11 as justifying a lack of careful attention to the terms of the Court's Order. Rather, given ample, repeated notice and sufficient opportunity to disseminate this information to all appropriate Justice Department employees, it should not have been too much to expect strict compliance with the Order by the time this case approached trial, and certainly during the trial itself. Indeed, even absent a specific order, this or any Court has the right to expect that a lawyer, and particularly an attorney for the Government, will exercise the utmost restraint in making comments about evidence or witnesses in the midst of a trial—and, even more so, comments about the credibility of a witness or the value of his testimony to a party. As noted at the outset, it is a basic tenet of our system of justice that trials are conducted in the courtroom, and not the media. If a violation under these circumstances does not necessarily bespeak willfulness, it at least is indicative of a disquieting lack of professional vigilance and care.

Nonetheless, other considerations militate against a finding of willfulness. First, while it bears emphasis that even a brief or passing remark can undermine a fair trial, the Court acknowledges the Government's point that the Attorney General's limited reference to this case at his April 17, 2003 press conference cannot readily be viewed as an egregious or blatant attempt to prejudice the jury—the Attorney General did not, for example, explicitly characterize Youssef Hmimssa as "honest" or "candid," but instead stated somewhat more obliquely that his testimony was of "substantial value." Similarly, while the Government's alternative, more innocent interpretation of this remark does not take

it outside the proscriptions of the October 23, 2001 Order, the Court recognizes that it is possible to construe this statement, within the larger context of the press conference as a whole, as merely intending to cite Youssef Hmimssa as one of several examples of individuals who have assisted the Government's war on terror by cooperating and providing information about potential terrorism-related activities. If this were the message the Attorney General meant to convey, it would lie more at the periphery than the core of the concerns that animated the October 23, 2001 Order. At a minimum, this element of ambiguity undercuts a finding of willfulness—a statement deliberately intended to violate the October 23, 2001 Order might well be expected to be considerably more direct in its meaning.

Next, as was the case with the Attorney General's first statement about this case, his second statement was not delivered in a forum and fashion that would have inevitably or unavoidably posed a danger of prejudice to these proceedings. While, as noted, it certainly was not prudent to offer any comment at all on the testimony in an ongoing trial, the April 17, 2003 press conference, like the earlier press briefing, was part of a series of the Attorney General's legitimate ongoing efforts to keep the country informed about the latest developments in the war on terror. In this setting, somewhat removed both geographically and by subject matter from the proceedings before this Court, an isolated comment about this case would not necessarily be expected to directly and dramatically undermine Defendants' right to a fair trial. And, as the Government points out, no actual prejudice resulted from the Attorney General's remarks, because the jurors scrupulously adhered to this Court's instruction that they should avoid reading or viewing any reports

about the case. While these considerations are not conclusive proof of inadvertence versus willfulness, the Court cannot help but believe that a deliberate violation of the October 23, 2001 Order would be better designed and targeted to achieve some impermissible objective, and that the improper intentions of the violator would be reasonably evident in the record. Simply stated, no such indicia of criminal intent are present here.

More generally, when the Attorney General's two violations are viewed collectively and in light of their surrounding circumstances, the consistent picture that emerges is one of carelessness, as opposed to a willful intent to violate the Court's Order and prejudice these proceedings. There was no ongoing series of incidents, but instead two isolated episodes separated by eighteen months. The statements regarding this case were not blatantly inflammatory or designed to attract attention, but instead were quite brief, somewhat vague and, in one instance, quickly retracted. The Attorney General's remarks were not directly aimed at these proceedings, but instead were delivered as part of much broader messages to a much wider audience concerning the Nation's war on terror. These circumstances, in short, are nothing like those presented in the typical cases where attorneys have been found guilty of criminal contempt for making prejudicial public comments about an ongoing proceeding.

Still more generally, the Court fully appreciates and recognizes the dual and sometimes competing responsibilities of the Attorney General as a senior executive branch officer and the Nation's chief prosecutor. Although the Attorney General's specific comments regarding this case were inappropriate in his role as prosecutor, the remainder of his remarks at the October 31, 2001 and April 17, 2003 press briefings surely represented a legitimate and appropriate exercise of his duty as a Cabinet official to inform the public about matters of executive policy and governance. To the extent that the Attorney General and his staff failed to properly reconcile the obligations imposed under these two roles, this lack of careful review, oversight, and attention to detail is not indicative of criminal intent to violate a court order, and the proper remedy is not a fine or imprisonment of the Justice Department's most senior official. To be sure, the violations here strongly indicate that the process employed by the Attorney General and his staff in preparing the comments at issue is in need of close examination and reform. Yet, a criminal contempt charge is a wholly unsuited instrument for exploring any such defects in Justice Department procedures.

To be sure, these apparent procedural flaws produced two lamentable incidents in this case, disrupted the orderly conduct of the proceedings, and created a significant risk of prejudice to Defendants' fair trial rights. The Court fully shares defense counsel's frustration at the unnecessary diversion of resources and attention to address the Attorney General's two violations of the October 23, 2001 Order. Beyond this, the Court has a responsibility to ensure that judicial orders are obeyed by all, no matter the importance of the office they hold. Yet, the present record simply fails to indicate, let alone establish beyond a reasonable doubt, that the Attorney General willfully violated this Court's Orders. Hence, this record provides no basis for pursuing criminal contempt charges under § 401(3).

**C. Further Proceedings To Explore Issues of the Attorney General's Intent Are Not Warranted Under the Circumstances.**

■ The preceding analysis rests exclusively upon the present record, and the

Court freely acknowledges that this record is limited in certain important respects. Defendants correctly point out, for example, that the Government's initial response to their motion was prepared and signed by the U.S. Attorney for this District, and included assertions about the Attorney General's intent that were not supported by any affidavit, testimony, or statement of any kind. Although the Attorney General's subsequent letter to the Court fills this gap in the record, opposing counsel in an ordinary case would be permitted to test such a statement through depositions, other forms of discovery, or cross-examination at an evidentiary hearing. Nonetheless, for the reasons explained below, the Court finds that further discovery or hearings on matters relating to the Attorney General's intent would be neither beneficial nor prudent.

First and foremost, it bears emphasis that the Attorney General wrote his November 26, 2003 letter to the Court "not only as the Attorney General to the United States, but also as an officer of the court." (Attorney General's 11/26/2003 Letter at 1.) This is significant to the Court. As an officer of the court, the Attorney General owes a professional duty of candor toward this tribunal, and is ethically bound to be accurate and complete in his representations to the Court. *See* ABA Model Rules of Professional Conduct, Rule 3.3. "Attorneys are officers of the court, and when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath." *Holloway v. Arkansas,* 435 U.S. 475, 486, 98 S.Ct. 1173, 1179, 55 L.Ed.2d 426 (1978) (internal quotations and citation omitted); *see also United States v. Talley,* 194 F.3d 758, 763 (6th Cir.1999) (stating that an Assistant U.S. Attorney who had been admonished by the District Court "appeared remorseful and apologetic" at oral argument before the appellate court, and that, "[r]ecogniz-

ing that he is an officer of the court, we take him at his word"), *cert. denied,* 528 U.S. 1180, 120 S.Ct. 1217, 145 L.Ed.2d 1118 (2000); *Smith v. Anderson,* 689 F.2d 59, 64 (6th Cir.1982) (observing that statements made by an attorney in his capacity as an officer of the court "are made as if upon oath").

Accordingly, the Attorney General's statements in his letter, on matters of intent that are uniquely within his own personal knowledge, are entitled to considerable deference. While not under oath, these statements are imbued with comparable indicia of truthfulness, as they carry the potential for disciplinary measures if they are discovered to be untrue. Moreover, as Justice Frankfurter once observed regarding representations made by a U.S. Attorney:

It surely is not the duty of a district judge to investigate a response by one who is an officer of the court as well as of the United States on the assumption that he has intentionally or irresponsibly violated his responsibility to the court and the Government in conducting the Government's case in a manner consistent with basic legal ethics and professional care.

*Campbell v. United States,* 365 U.S. 85, 103, 81 S.Ct. 421, 431, 5 L.Ed.2d 428 (1961) (Frankfurter, J., dissenting in part). Surely, this is no less true of a statement by the Attorney General as an officer of the court.

Next, because the Attorney General's letter "personally ... address[es]" the Court's concerns about possible violations of its October 23, 2001 Order, and because a criminal contempt charge likewise turns upon issues of individual intent, there seemingly would be no way to test or explore the statements in the letter without requiring the Attorney General himself

to testify. Such a procedure, however, raises substantial constitutional concerns. As observed by the Second Circuit in a case also involving the question whether contempt sanctions should be imposed on the Attorney General:

This case is unusually important for another reason because the order for which review is sought adjudged the Attorney General of the United States in civil contempt. Although we unequivocally affirm the principle that no person is above the law, ... we cannot ignore the fact that a contempt sanction imposed on the Attorney General in his official capacity has greater public importance, with separation of power overtones, and warrants more sensitive judicial scrutiny than such a sanction imposed on an ordinary litigant.

Socialist Workers Party v. Attorney General (In re Attorney General of the United States), 596 F.2d 58, 64 (2d Cir.), cert. denied, 444 U.S. 903, 100 S.Ct. 217, 62 L.Ed.2d 141 (1979).

More specifically, the Government points to a number of cases in which the courts have declined to order the appearance or testimony of Cabinet officers or other senior Government officials, absent exceptional circumstances and a compelling need for information that is not otherwise obtainable. See, e.g., In re United States, 197 F.3d 310, 314 (8th Cir.1999) (quashing subpoenas directing Attorney General Janet Reno and Deputy Attorney General Eric Holder to testify regarding the procedures used in deciding whether to pursue the death penalty); In re United States, 985 F.2d 510 (11th Cir.) (quashing subpoena directing the FDA Commissioner to testify), cert. denied, 510 U.S. 989, 114 S.Ct. 545, 126 L.Ed.2d 447 (1993); In re Office of Inspector General, Railroad Retirement Board, 933 F.2d 276, 278 (5th Cir.1991) (cautioning the District Court on

remand to "remain mindful of the requirement that exceptional circumstances must exist before the involuntary depositions of high agency officials are permitted"); see also Jones v. Clinton, 36 F.Supp.2d 1118, 1132–34 (E.D.Ark.1999) (electing to address only the misconduct of former President Clinton that was indisputably established in the record, and citing various grounds for avoiding further hearings to explore other possibly contumacious conduct). "Allegations that a high government official acted improperly are insufficient to justify the subpoena of that official unless the party seeking discovery provides compelling evidence of improper behavior and can show that he is entitled to relief as a result." In re United States, 197 F.3d at 314.

The conduct at issue here unquestionably is that of the Attorney General himself and his direct staff, as opposed to a more general matter of departmental policy or agency decisionmaking. Nonetheless, there is no compelling need here for the Attorney General's in-court testimony. As noted earlier, all of the direct evidence of record concerning the Attorney General's state of mind uniformly indicates that his comments about this case were not willfully intended to violate the October 23, 2001 Order, but rather were the product of inadvertence and a lack of careful, rigorous oversight. In particular, the Attorney General has stated, as an officer of the court, that he "had no intent either to disregard the Court's Order or to disrupt the ongoing trial proceedings." In addition, the Court already has found that the circumstantial evidence tends to support this assertion. This seemingly forecloses any determination, especially beyond a reasonable doubt, that the Attorney General acted with criminal intent. The Attorney General's further testimony on this issue would be necessary only if one were prepared to believe that he might recant

the statements in his November 26, 2003 letter, and instead acknowledge a willful violation of the Court's Order. Needless to say, there is no conceivable basis for believing that the Attorney General's sworn testimony would deviate in any respect from his statements in his recent letter.

Moreover, as a practical matter, any meaningful inquiry into the statements at issue here would not begin and end with the Attorney General himself, but surely would extend to members of his immediate staff. After all, the Attorney General surely is not the sole and exclusive, or likely even the principal, author of the statements he makes at press briefings. Rather, such statements undoubtedly are the product of a number of staffers, each of whom would have to be examined to determine: (i) whether he or she authored one of the statements about this case; (ii) whether the drafters of these statements were made aware of the Court's October 23, 2001 Order; and (iii) if so, whether they nonetheless inserted the statements into the Attorney General's press briefings with the deliberate intent of violating this Order. No matter how such an investigation might unfold, it is exceedingly unlikely to reveal that the Attorney General himself commented about this case with the willful intent to violate the October 23, 2001 Order.

All of this brings the Court back to the point made earlier. Any further inquiry into the circumstances surrounding the Attorney General's statement is far more likely to reveal flaws in the process employed by his staff in drafting and reviewing his public communications. As is evident from the incidents in this case, and as the Attorney General himself acknowledges in his letter to the Court, he and his staff "need to be more careful when including references to ongoing cases" in his remarks to the media. No wild speculation is necessary to postulate that the statements made by the Attorney General in his public policy role are not being sufficiently vetted by seasoned staff with prosecutorial experience to ensure that no improper or potentially prejudicial remarks are made about pending cases. It is inconceivable to the Court that lawyers with experience in conducting criminal investigations and trials would have permitted the comments about this case to be included in the Attorney General's prepared remarks—particularly after twice being specifically put on notice by the Court that such statements were prohibited. If this lack of careful review was the cause of the violations of the Court's Order, and if the objective is to take meaningful and measured steps to sanction these violations and ensure that they are avoided in the future, the Court firmly believes that a criminal contempt proceeding is not an effective and appropriate mechanism for achieving these objectives.

Indeed, to the extent that the Attorney General's transgressions here were attributable to an improper balancing of his public policy and prosecutorial roles, there is ample reason for the Court to proceed with caution, and to ensure that any punitive or disciplinary measures do not unduly encroach upon the Attorney General's legitimate political functions. The Sixth Circuit stressed a similar point in *Ford, supra,* in which the District Court had imposed a broad "do-not-discuss" gag order upon the defendant member of Congress:

> ... [T]he doctrine of separation of powers—a unique feature of our constitutional system designed to insure that political power is divided and shared—would be undermined if the judicial branch should attempt to control political communication between a congressman and his constituents. It would tend

to undermine the representative nature of the democratic process and the legislator's responsibility to the electorate to account for his actions .... A representative's legislative role is not limited to formal speech and debate in Congress but includes communication with the electorate.

*Ford,* 830 F.2d at 601 (citation omitted). Much the same can be said about the Attorney General as a political appointee of the President.

Apart from all of these prudential concerns, the Court must consider certain procedural constraints as well. In particular, it would be no simple matter to secure the Attorney General's testimony regarding his statements at the October 31, 2001 and April 17, 2003 press conferences. The Court could not, for example, merely order the Attorney General to appear at an evidentiary hearing and testify about his actions. Rather, so long as criminal contempt charges remain in play, any proceedings must comport with the dictates of Fed.R.Crim.P. 42(a) and the Constitution—formal notice must be given, a prosecutor must be appointed,[20] and the Attorney General must be accorded the full panoply of constitutional protections, including the privilege against self-incrimination. The record in support of criminal contempt charges here falls well short of warranting the engagement of this complex machinery.

Finally, even assuming all of these considerable obstacles could be (and should be) overcome, and even in the unlikely event that further investigation uncovered some evidence of a willful violation, the Court then would face the unsettling prospect of recommending that criminal con-

tempt charges be brought against a sitting Cabinet officer. Again, it is instructive to consider the observations of the Second Circuit as it reviewed an order holding then-Attorney General Griffin Bell in civil contempt of court for failing to obey an order to disclose information about confidential government informants:

We begin our analysis of the merits by stressing two considerations. The first is the nature of the contempt power itself. Just as, we trust, an Attorney General would not lightly invoke a privilege such as the one that he invokes here, so too the court must not lightly invoke its contempt power. For the exercise of that power is, even in the context of a private attorney, awesome in its implications. Second, in an extraordinary case such as this, the significance of abuse of discretion is magnified .... Here, as noted above, the contemnor is not simply an attorney but the chief law enforcement officer of the nation, a public official who exercises powers entrusted to him by both the executive and legislative branches, with obligations to the judicial branch, and who is the principal attorney for another branch of government coequal to the judicial branch in constitutional function and design. Courts accordingly owe him respect as an official and, absent an abuse of power or misuse of office, the most careful and reasoned treatment as party or as litigant.

*Socialist Workers Party,* 596 F.2d at 65 (internal quotations, citations, and footnote omitted).

To invoke the Court's contempt power here would implicate both of these concerns. This Court is unwilling to incur

---

**20.** Notably, U.S. Attorney's Office could not undertake this task, as any Department of Justice official would be operating under a conflict of interest. Needless to say, it would be no simple undertaking for the Court to identify and appoint a suitable prosecutor in this matter.

such substantial costs without any realistic prospect of a commensurate gain, whether as to vindication of the Court's authority, discipline against those who violate its orders, or prevention of similar violations in the future. Rather, as set forth below, the Court finds that its inherent disciplinary powers are sufficient to achieve its desired objectives in this case.

**D. The Court Finds that a Formal Judicial Admonishment Is the Appropriate Sanction for the Attorney General's Violations of Its Order.**

■ The Court's determination that its criminal contempt powers should not be exercised here does not bring the matter to an end. The Court's October 23, 2001 Order was violated on two occasions, and these incidents threatened the fairness of these proceedings. It has long been recognized that federal courts have the inherent power to discipline attorneys who violate their orders, separate and apart from their authority under the contempt statutes. *See, e.g., Chambers v. NASCO, Inc.,* 501 U.S. 32, 43–44, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991); *Ex parte Robinson,* 86 U.S. (19 Wall.) 505, 512, 22 L.Ed. 205 (1873); *Smothers,* 322 F.3d at 442; *Jones,* 36 F.Supp.2d at 1124–26. The Supreme Court has explained:

> The ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches. "If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls 'the judicial power of the United States' would be a mere mockery." *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 450, 31 S.Ct. 492, 501, 55 L.Ed. 797 (1911).

*Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 796, 107 S.Ct. 2124, 2131–32, 95 L.Ed.2d 740 (1987). Although the range of options is perhaps more limited here than in a civil case, where such measures as fee-shifting and issue preclusion may be employed, the Court nonetheless possesses "the flexibility to equitably tailor punishments that appropriately fit the conduct" at issue here. *Smothers,* 322 F.3d at 442.

Before considering various possible measures, the Court first believes it important to explain why, in its judgment, some form of sanction is necessary here. Most significantly, of course, the Attorney General violated the Court's October 23, 2001 Order on more than one occasion. As observed earlier, the first of these transgressions was perhaps understandable, particularly under the extraordinary circumstances that existed in the immediate aftermath of September 11, and in light of the difficult and challenging matters of the utmost national concern that the Attorney General confronted at the time. In addition, the Court must consider that, while Justice Department officials had been promptly furnished with a copy of the October 23, 2001 Order, the Attorney General himself and his immediate staff might well have lacked actual notice of this Order at the time of his first public comment about the case.

Matters were far different, however, by the time of the Attorney General's most recent public statement about this case. First, in the intervening period, a draft indictment apparently was leaked to the media before it had been returned by the grand jury, itself a very serious matter. In addition, during this same period, the Court had directly spoken with very senior Justice Department officials on two separate occasions, both times eliciting prom-

ises that the Attorney General and his letter to the Court that "no one really staff would be advised of the terms and demands of the October 23, 2001 Order and that there would be no further incidents. As a further result of these conferences, Deputy Attorney General Lawrence D. Thompson prepared a memo addressed directly to the Office of the Attorney General, among other Justice Department entities, which expressly recounted the terms of the October 23, 2001 Order and cautioned against "making any statements about this case except in strict compliance with the Court's order." Despite all this, the Attorney General commented publicly about this case a second time—and did so at a most sensitive moment in these proceedings, in the middle of trial.

Nor can the Court overlook the very real threat of prejudice that arose as the result of the Attorney General's remarks. In the first, Defendants were erroneously linked to the September 11 attacks—an allegation arguably as damaging as any that could be made against a subject of a criminal indictment, particularly in the weeks immediately following the tragic events of that day. In the second, the Nation's highest law enforcement official stated, in the middle of a trial, that the testimony of a key Government witness had been of "substantial value" to the Government. It bears repeating that even absent a court order, such a remark would have been inappropriate, if not improper.

The Court recognizes that no actual prejudice in fact resulted from these public comments. The jury was subject to extensive and searching *voir dire* before trial, and to further *voir dire* in light of the Attorney General's statement during the trial, and this process failed to reveal any prejudice to Defendants. While defense counsel opine in their December 9, 2003

letter to the Court that "no one really knows whether the jurors were completely candid about their exposure to the public comments by the Attorney General," the Court is confident that the jury *voir dire* in this case went to the greatest extent possible to uncover any such improper external influences, and that the jury solemnly discharged its duties and truthfully answered the inquiries of the Court and counsel alike.[21]

Nonetheless, the ***potential*** for prejudice was undeniable under the circumstances. Particularly as to the Attorney General's second remark, the Government must count itself fortunate that the jurors heeded this Court's instruction and avoided any media reports about the case. If matters had unfolded differently, this Court would have been faced with the most difficult of decisions, coming after months of rigorous and demanding pretrial preparations and in the midst of a lengthy trial. It was precisely to ***avoid*** such a dilemma, and to instead ensure a trial environment free of outside influences and prejudices, that the Court and the parties agreed that public communications about the case should be strictly and closely regulated. Under the circumstances, the Court simply cannot look the other way at two separate violations—the second after repeated warnings—of a stipulated Order which was entered for the very purpose of safeguarding Defendants' inviolate right to a fair trial.

The Court also recognizes, and sincerely appreciates, that the Attorney General has conveyed his personal apology to the Court and counsel, has expressed his regret for making the statements at issue here, and has acknowledged that he "made a mistake" in making these statement. On this matter, the Court does not share defense

---

21. Notably, as observed earlier, defense counsel declined the opportunity to question the

individual jurors any further about the Attorney General's statement during the trial.

counsels' reservations that the Attorney General's apology is "insufficient" or that his letter might not be "sufficiently contrite." Rather, this Court places great weight and significance upon such personal expressions of regret by a sitting Cabinet official. Indeed, it is with a great deal of hesitation that the Court considers the imposition of sanctions, in the face of the Attorney General's personal and direct assertion that "I take these matters very seriously and will make every effort to ensure that the difficulties occasioned in this instance will be avoided in the future." On this subject, as with the others addressed in his letter, the Court takes the Attorney General at his word.

Nonetheless, the two serious transgressions committed in this case are simply one too many for the Court to abide with no response. The steps that the Attorney General now promises to take should have been taken after the first violation of the Court's Order or, at a minimum, after a senior Justice Department official had attended the second of the conferences convened by the Court to underline the obligations imposed under its Order and emphasize that the Order would be strictly enforced. Although a memo was circulated among the Office of the Attorney General, this apparently did not occasion any sort of review, or an effective review at any rate, of the procedures used to vet proposed public statements about pending cases.

Even beyond the specific Order entered in this case, and the particular incidents that arose concerning this Order, the Attorney General and his staff seemingly should have been more aware of the concerns triggered by references to pending criminal investigations or proceedings. This is not a new issue, after all, nor is it unique to Attorney General Ashcroft—rather, it has been confronted by other Attorneys General in the past. Consider, for example, an opinion issued by the American Bar Association back in January of 1940, addressing possible concerns with the Attorney General's announcement in May of 1938 that "the Department of Justice would from time to time issue public statements throwing light on the prosecution policy with respect to anti-trust laws." ABA Comm. on Prof'l Ethics and Grievances, Formal Op. 199 (1940). This opinion states in part:

The Attorney General is the executive head of the Department of Justice of the United States. He and his subordinates are the legal representatives of the United States in all proceedings, both civil and criminal, in the courts of the United States in which the United States is a party or has an interest. In a broad aspect the Attorney General is attorney for the body politic. Therefore, in publishing his reports and in issuing public statements for dissemination through ordinary news channels, he is reporting to the public. Herein lies a material difference between a report or press release issued by the Attorney General and one given out by an attorney for a private client. Notwithstanding this difference, certain limitations should be regarded in giving out press releases by the Attorney General respecting pending or prospective litigation in order that the rights of the defendants, both in criminal and civil prosecutions, be neither impaired nor prejudiced.

The experienced trial lawyer knows that an adverse public opinion is a tremendous disadvantage to the defense of his client .... Trials are open to the public, and aroused public opinion respecting the merits of a legal controversy creates a court room atmosphere which, without any vocal expression in the presence of the petit jury, makes

itself felt and has its effect upon the action of the petit jury. Our fundamental concepts of justice and our American sense of fair play require that the petit jury shall be composed of persons with fair and impartial minds and without preconceived views as to the merits of the controversy, and that it shall determine the issues presented to it solely upon the evidence adduced at the trial and according to the law given in the instructions of the trial judge.

\* \* \* \* \* \*

An examination of the public statements and a discussion thereof with the Assistant Attorney General in charge of the Anti–Trust Division leads us to conclude that a conscientious effort has been made to regard the limitations, to which we have adverted, in the formulation of these press releases.

However, in certain instances the public statements purport to state as facts actions of persons, associations, or corporations upon which the Department of Justice intends to predicate criminal or civil actions for violations of the federal anti-trust laws. Since these statements emanate from the high office of Attorney General, it is probable that the public will accept them without qualification or reservation. They might tend to inflame the public mind and create a public attitude adverse to the defendants to such proposed proceedings prior to grand jury investigation and trial of the criminal charges and the judicial determination of the civil complaint . . . .

\* \* \* \* \* \*

While we see no objection to statements reflecting departmental policy, nor to statements of fact relating to past proceedings in the nature of reports, when, as here, the statements relate to prospective or pending criminal or civil proceedings, they should omit any asser-

tions of fact likely to create an adverse attitude in the public mind respecting the alleged actions of the defendants to such proceedings.

*Id.* (citations omitted). In addition, the ABA has revisited this and related subjects in subsequent opinions. *See, e.g.,* ABA Comm. on Ethics and Prof'l Responsibility, Informal Op. 199 (1975).

This Court fully recognizes, as did the ABA in the above-quoted opinion, that the Attorney General occupies two roles of equal importance, one as the Nation's chief prosecutor, and one as the head of an Executive department with responsibilities to keep the public informed on policy matters. While these dual roles might occasionally lead in different directions, and while the Attorney General undoubtedly faces a difficult and challenging task in harmonizing these two roles, this nonetheless is, and has always been, an inescapable reality of the position of Attorney General.

It is not the place of this Court, and it is surely a matter beyond its competence and expertise, to tell the Attorney General how to organize and staff his Office in order to strike the appropriate balance between these sometimes-competing obligations. Yet, it is unquestionably the duty of this Court to ensure that the defendants who appear before it are accorded their fair trial rights under the Constitution, to enter orders designed to protect these rights, and to see that its orders are obeyed.

All trial counsel in this case scrupulously adhered to the October 23, 2001 Order at all times, save one defense attorney who was substituted out of the case well before trial. The incentive for defense counsel, in particular, to push the boundaries of the Court's Order surely was great, in light of the public passions and interest aroused in the aftermath of September 11 on all mat-

ters relating to terrorism. This incentive was only increased, of course, through the various public communications about this case that tended to favor the Government's position. Yet, throughout all this, defense counsel continued to proceed under the rules established by this Court. In the interests of fairness and equity, the Court must insist that everyone governed by the October 23, 2001 Order be judged by the same standards. Under the circumstances, the Court is firmly convinced that the statements at issue here would warrant sanctions against any attorney who made them, regardless of his position. That the Attorney General made them, therefore, cannot deter the Court from its usual course.

Accordingly, the Court considers which of the various available sanctions would be most appropriate here. In *Smothers, supra*, the Sixth Circuit suggested a non-exclusive list of sanctions short of contempt that a court might employ. First, as a general matter, the Court indicated that "progressive discipline" is the preferred approach, so as to identify the least severe and punitive, yet still effective means to respond to a transgression. *Smothers*, 322 F.3d at 442. Thus, an initial incident might warrant "a lecture from the court," or some similar form of warning. 322 F.3d at 442. Here, of course, the Court employed such measures on two separate occasions, following the Attorney General's first public comments about the case, and then again in connection with the leak of the Second Superseding Indictment. Yet, these warnings and resulting assurances failed to prevent a further violation. Plainly, then, more than a warning is necessary here.

The Sixth Circuit next suggested that a court might require "[a]n apology on the record." 322 F.3d at 442. The Attorney General has apologized personally to the Court and counsel in his November 26, 2003 letter, which is now a part of the public record in this case. As discussed earlier, this apology goes a long way toward addressing the Attorney General's violations of the Court's Order. The Court presumes that such apologies are rare, and that the Attorney General would not lightly or favorably regard the prospect of having to issue any similar sort of statement in a subsequent case. Because of this, the Court further presumes that the Attorney General will follow through on his assurance in his letter that he will "make every effort to ensure that the difficulties occasioned in this instance will be avoided in the future."

Nonetheless, the Court cannot help but observe that an apology was offered earlier in this case on behalf of the Attorney General, and that this did not prevent a subsequent violation of the October 23, 2001 Order. Specifically, at the November 2, 2001 *in camera* conference convened shortly after the Attorney General's initial public reference to this case, then-Assistant Attorney General Michael Chertoff, the head of the Justice Department's Criminal Division, expressed his regret for any disruption in the proceedings as a result of the Attorney General's remarks, and assured the Court that no further such incidents would occur during these proceedings. Consequently, the Court believes it necessary to advance to the next step in the regimen of progressive discipline.

The next category of sanction identified in *Smothers* is some form of attorney discipline, either imposed by the court itself or addressed through a reference to the appropriate bar association. *See Smothers*, 322 F.3d at 443. As to the latter option, the Court deems it both inappropriate and unnecessary to refer this matter to a bar association, for a number of reasons. As

is evident from this Opinion, this Court is amply familiar with the facts and circumstances surrounding the two violations of its Order, and it would be difficult, as well as wasteful of resources, for any disciplinary board to recreate this record. More importantly, because the conduct at here implicates its own Order, this Court is in a superior position to enforce its decrees and vindicate its own authority. It is solely the province of this Court, for example, to construe the "reasonable likelihood of prejudice" language of the October 23, 2001 Order, and to determine whether a public statement transgresses this prohibition.

Further, this matter does not concern the conduct of an attorney engaged in the traditional practice of law before this Court.[22] Rather, as observed earlier, it appears most likely that the violations here were a product of flawed procedures in the Attorney General's Office for reviewing public statements about pending cases. A bar disciplinary proceeding is an inappropriate forum for addressing a matter of this sort. Indeed, as noted earlier, it is likely that a full inquiry into the circumstances surrounding the Attorney General's statements would involve staff members in the Attorney General's Office, and not just the Attorney General himself. Having itself determined that such an investigation would be inappropriate and unnecessary, the Court cannot then invite a bar disciplinary board to undertake a similar inquiry.

Finally, and perhaps most importantly, the Court believes that its own disposition of this matter obviates the need for further review of the Attorney General's conduct in this case. For the reasons previously discussed, the Court has found no evidence of a willful violation of its Order. This being so, the Court finds no basis for referral or further disciplinary action, beyond whatever sanction the Court elects to impose here.

Without diminishing in the least the seriousness with which it views the Attorney General's conduct in this case, the Court considers any bar proceedings as both unnecessary, in light of the Court's own searching inquiry into and resolution of this matter, and as creating the potential for mischief if the Attorney General's critics would seek to exploit such proceedings for political purposes. For these reasons, the Court will not, on its own initiative, refer this matter to a bar association for further action, and the Court further believes that any such effort initiated by any other person or group would be inappropriate and unnecessary.

Nonetheless, the Court finds that the bar disciplinary scheme provides a useful point of reference in determining the appropriate sanction here. The American Bar Association, for example, has developed a set of standards for imposing lawyer sanctions, based on a number of considerations that the Court finds relevant and helpful in resolving the present matter.[23] First, the ABA Standards outline a sequence of disciplinary sanctions, ranging from the least severe, admonition, to the most, disbarment. *See* ABA Standards for Imposing Lawyer Sanctions, §§ 2.2–2.6.[24] Next, the Standards characterize different forms of attorney misconduct by reference

---

**22.** Because it does not, it is not even clear which State's bar association would be best suited to address the Attorney General's conduct in this case.

**23.** The Michigan courts have expressly adopted the ABA standards. *See Grievance*

*Administrator v. Lopatin,* 462 Mich. 235, 612 N.W.2d 120, 123 (2000).

**24.** Again, Michigan has adopted the same range of sanctions. *See* Michigan Court Rule 9.106.

to (i) the nature of the ethical duty violated, (ii) the lawyer's mental state, (iii) the extent of the actual or potential injury caused by the lawyer's conduct, and (iv) any aggravating or mitigating factors. *See* ABA Standards, § 3.0. Upon performing the analysis suggested under these Standards, the Court finds that the least severe form of sanction, an admonition, is warranted here.

Regarding the nature of the duty violated here, the Court finds that the Attorney General's conduct implicates duties owed to the legal system. Within this general rubric, the ABA Standards distinguish among (i) false statements, fraud, and misrepresentation; (ii) abuse of the legal process; and (iii) improper communications with individuals in the legal system. *See* ABA Standards, §§ 6.1–6.3. The second of these categories is most applicable here, as it encompasses a "failure to obey any obligation under the rules of a tribunal." *See id.*, § 6.2. The Standards then provide:

> Absent aggravating or mitigating circumstances, ... the following sanctions are generally appropriate in cases involving ... failure to obey any obligation under the rules of a tribunal ...:
>
> 6.21 Disbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding.
>
> 6.22 Suspension is generally appropriate when a lawyer knows that he or she is violating a court order or rule, and causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding.

> 6.23 Reprimand is generally appropriate when a lawyer negligently fails to comply with a court order or rule, and causes injury or potential injury to a client or other party, or causes interference or potential interference with a legal proceeding.
>
> 6.24 Admonition is generally appropriate when a lawyer engages in an isolated instance of negligence in complying with a court order or rule, and causes little or no actual or potential injury to a party, or causes little or no actual or potential interference with a legal proceeding.

ABA Standards, § 6.2.

In this Court's view, the violations here fall at the boundary of those warranting a reprimand and those calling for an admonition. Because the Attorney General did not willfully violate the Court's Order, the more severe forms of discipline clearly are not warranted in this case. Rather, the Attorney General's public statements about this case were a product of inadvertence, thereby suggesting a choice between a reprimand and an admonition.

■ Under the totality of the circumstances presented, the Court finds that the latter, less severe form of sanction is best suited to address the Attorney General's conduct. Although the Attorney General violated the Court's Order on two occasions, the length of time between these incidents and the arguable lack of notice at the time of the first violation lead the Court to view the Attorney General's conduct as "isolated," and hence deserving of a lesser sanction. Next, while the Attorney General's comments created a real potential for prejudice and interference with these proceedings, the Court already has observed that no actual prejudice resulted from these remarks.

Moreover, several of the mitigating factors outlined in the ABA Standards tip the

balance decisively toward the lesser sanction of admonition. There is no evidence of an improper motive here, *see id.,* § 9.32(b)—to the contrary, the Attorney General made the statements at issue in service of his legitimate and vital obligation to keep the Nation informed about the Justice Department's efforts in the war on terror. In addition, particularly with regard to the first statement, the Attorney General's Office made a "timely good faith effort ... to rectify [the] consequences of" the remarks by issuing a prompt retraction. *See id.,* § 9.32(d). Finally, and most importantly, the Attorney General has cooperated in this matter, *see id.,* § 9.32(e), and has issued a personal apology to the Court and counsel, *see id.,* § 9.32(m). As observed earlier, the Court places great weight on this expression of regret, as well as the Attorney General's personal assurance that he will make every effort to ensure that his public statements in the future do not include inappropriate references to pending cases.

Consequently, the Court elects to formally and publicly admonish the Attorney General for his public statements about this case, which violated the Court's October 23, 2001 Order.[25] The Court has selected this sanction—the most modest among the range of disciplinary measures that may be imposed upon attorneys—because of the inadvertent nature of the violations here, and because of the Attorney General's personal apology and assurance that such incidents will not occur in the future. In electing to impose this sanction, this Court's principal objective is not to punish, but instead to encourage procedural reforms in the Attorney General's Office, so that staff members with professional prosecutorial experience are fully involved in the process of formulating public statements that refer to pending cases or investigations. Through this or equivalent means, the Court hopes and expects that the incidents which arose in this case will not recur in subsequent proceedings.

## IV. CONCLUSION

In his November 26, 2003 letter to the Court, Attorney General Ashcroft rightly observes that "[t]his was, of course, a very important terrorism case for our nation and the Department of Justice, and as the Attorney General, I have a duty to keep the American people informed of the Department's progress against terrorism." In response, defense counsel just as aptly observes that "there was no superior duty on the part of an Attorney General that transcended the defendants' right to a fair trial." These dual obligations may pose a considerable challenge, particularly at critical times in our Nation's history, but it is essential to the proper functioning of our system of justice that the Attorney General strike the proper balance between these roles.

More specifically, in circumstances like those presented here, the Attorney General must ensure that his public comments about pending cases are carefully crafted and reviewed to avoid any potential preju-

---

**25.** The Court recognizes that admonitions generally are a private form of discipline. *See* ABA Standards, § 2.6; *see also* Michigan Court Rule 9.106(6). Nonetheless, the Attorney General's statements about this case were widely reported in the media, Defendants' motion is part of the public record in this case, and the possibility of contempt proceedings against the Attorney General has been a frequent topic in news accounts of this case. More generally, the position of Attorney General is, by its very nature, a highly visible and public office. Indeed, it is for precisely this reason that his statements about this case were particularly problematic. Under these circumstances, the Court's resolution of this matter necessarily and unavoidably is, and should be, available for public scrutiny.

dice to the parties or interference with the proceedings. The Attorney General and his staff fell short of this standard on two occasions in this case, violating an Order which prohibited such potentially prejudicial public remarks. Upon considering all of the circumstances surrounding these incidents, the Court determines that criminal contempt proceedings are not warranted, but that the modest sanction of admonishment is instead appropriate.

For these reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' August 28, 2003 Motion to Require Attorney General John Ashcroft to Show Cause Why He Should Not Be Held in Contempt is DENIED. Instead, IT IS ORDERED that Attorney General John Ashcroft be, and hereby is, formally and publicly admonished for violating the Court's October 23, 2001 Order.